**STATE of Utah, Plaintiff and Appellee,**

v.

**Carl William SCALES, Defendant and Appellant.**

**No. 960745–CA.**

Court of Appeals of Utah.

Sept. 18, 1997.

Manny Garcia, Salt Lake City, for Defendant and Appellant.

Jan Graham, Attorney General, and J. Frederic Voros Jr., Assistant Attorney General, Criminal Appeals Division, Salt Lake City, for Plaintiff and Appellee.

Before WILKINS, Associate P.J., and BILLINGS and ORME, JJ.

## OPINION

WILKINS, Associate Presiding Judge:

Defendant Carl William Scales appeals from a final judgment entered after a jury trial in which the jury found him guilty of one count of murder, a first degree felony, in violation of Utah Code Ann. § 76-5-203 (1995), and five counts of theft, a second

degree felony, in violation of Utah Code Ann. § 76-6-404 (1995). We affirm.

## BACKGROUND

"In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict," and recite the facts of this case accordingly. *State v. Dunn*, 850 P.2d 1201, 1205-06 (Utah 1993).

In May 1995, defendant and Kayleen Jones were married in Arizona. The next month, they moved into a trailer owned by Kayleen's brother, Wade Jones, on a ranch in Upton, Utah. Wade had left three firearms, two .22 caliber rifles and a 30-06, in a hidden compartment in the trailer.

On Sunday, August 6, 1995, Wade was working at a water well near the trailer. Defendant told Wade he was going to clean out a storage tank that contained a rat he wanted to shoot. To enable defendant to kill the rat, Wade loaned him a .22 Ruger automatic rifle and a loaded clip.

That night, Kayleen's mother, who lived in a house near the trailer, was working outside in her yard. While she was out working, around 9:30 p.m., she heard defendant and Kayleen yelling at each other in the trailer. After about five minutes, the yelling stopped. Kayleen's mother did not see or hear Kayleen or defendant the rest of the evening.

The next morning, defendant visited Kayleen's grandmother, who also lived on the ranch. Defendant told her that he was having problems with his car and that he was supposed to be in South Fork, which was approximately six or seven miles away, in thirty minutes. He said Kayleen had told him her grandmother might be willing to let him borrow her car so he could get to South Fork on time. Kayleen's grandmother told him her car, a Monte Carlo, was unlicensed and did not have very much gasoline in it. Defendant told her he had gasoline. Kayleen's grandmother then gave him the keys and told him not to drive the car farther than South Fork.

Defendant then went back to the trailer and loaded Wade's four weapons—the two .22 rifles, the 30-06, and the Ruger .22—into

the Monte Carlo's trunk. After leaving the trailer, where he left his wallet, defendant drove west on Interstate 80. On the way, defendant picked up two hitchhikers. Defendant did not appear to the hitchhikers to be purposely driving toward any particular destination. When asked by the hitchhikers where he was going, defendant gave a vague response. Defendant told the hitchhikers that "he had a little trouble at home," and that he "just wanted to get away for a while."

Defendant also told the hitchhikers he had some guns he wanted to sell because he was short on money. Defendant sold the 30–06 to a man in a bar in Wells, Nevada for $100 and two beers. He also sold the Ruger .22 for $25 at a gas station in Valmy, Nevada.

That evening, Kayleen's mother walked over to the trailer to talk to Kayleen, but found all three exterior doors to the trailer locked. Concerned, Kayleen's mother called Wade, who came over. Wade unlocked and entered the trailer. He found Kayleen's dead body on the bed in the master bedroom. One pillow covered her head and was saturated with blood. Another pillow was next to her head. Spent .22 casings were strewn about the room. It was later determined that the spent casings had been fired from the Ruger .22 Wade had loaned to defendant to kill the rat in the storage tank. The trailer contained no signs of either a struggle or a forced entry. In addition, no defensive wounds were found on Kayleen's body. On the floor at the entrance to the master bedroom was a necklace. Inside on the bedroom floor was Kayleen and defendant's marriage certificate, which had been torn into pieces. It was later determined that Kayleen had been killed by being shot with the Ruger .22 five or six times in the head through the two pillows.

Defendant, who was still driving the borrowed Monte Carlo, was apprehended the next day in Reno, Nevada. Wade's two .22 rifles were found in the car's trunk.

Defendant was charged in a single information with one count of murder and five counts of theft.[1] He was appointed an attor-

ney, Glen Cook, and pleaded not guilty to all counts.

In October 1995, following his arraignment, defendant filed a pro se motion to have Cook removed as his counsel. The record contains no minute entry or order regarding this motion; however, the trial court's docket entry indicates that a motion hearing was held and that the trial court struck defendant's motion because "the problem ha[d] been resolved."

In January 1996, defendant filed a second pro se motion to have Cook removed as his counsel. Defendant's motion alleged several grievances regarding his relationship with Cook, including that "numerous face to face conversations [between defendant and Cook] have resulted in total polarity. There appears to be no attempt to understand the requests and questions that the undersigned asks to the extent that several jailers have expressed concern regarding the relationship." After holding another hearing, the trial court granted this second motion. The court then appointed Joseph C. Fratto, Jr. to represent defendant.

In February 1996, upon learning that his former wife had just died of cancer, defendant began a fast. Defendant refused to eat solid foods, stating that he wanted to experience the suffering his former wife experienced while she was dying of cancer. Forty-one days into the fast, the State filed both a Petition for Inquiry into Mental Condition of Defendant and a Petition to Force–Feed Defendant. In response to these motions, the trial court ordered that defendant be committed to the Utah State Hospital for thirty days for observation and treatment. After defendant's condition was assessed, the trial court held another hearing. The trial court concluded defendant was competent to stand trial.

In April 1996, defendant, through Fratto, moved to sever the murder count from the theft counts on the ground that "the substance of these offenses do not constitute a single criminal episode." After a hearing,

---

1. The five theft counts alleged that defendant unlawfully took Kayleen's grandmother's Monte Carlo and Wade's four firearms.

the trial court entered findings of fact and conclusions of law and denied the severance motion.

Also in April 1996, defendant, independently of Fratto, sent the Utah State Bar a letter requesting both a change of venue and that Fratto be dismissed as his counsel. In the letter, defendant alleged that his confidence in Fratto was shaken, that Fratto's investigator had failed to follow up with defendant as promised, that Fratto had initiated and arranged with the prosecuting attorney to transfer defendant to the Utah State Hospital, and that Fratto ignored defendant's social worker's request to have legal materials sent to the hospital.

On May 3, 1996, twenty-seven days before the trial was scheduled to begin, Fratto moved to withdraw as defendant's counsel. In an affidavit, Fratto testified to circumstances evidencing that his relationship with defendant had deteriorated. These circumstances included defendant's refusal to meet with Fratto, defendant's letter to the Utah State Bar requesting a change of venue and dismissal of Fratto as his counsel, and defendant's requests for copies of documents and information relating to his case.

Later that month, the trial court held a hearing. On May 24, the court denied Fratto's motion to withdraw, but ordered that the case be continued from May 29, 1996, to July 9, 1996, "at the request of defendant's counsel to enable him to prepare for trial with or without the cooperation of defendant." The court denied Fratto's motion to withdraw because of the following four reasons: (1) the court had already removed one attorney, Cook, from the case at defendant's request; (2) Fratto was an experienced, qualified, and competent attorney; (3) there was no legitimate basis for defendant's refusal to speak or cooperate with Fratto in the preparation of the case; and (4) the court had no reason to believe, based on defendant's past behavior, that defendant would cooperate or be satisfied with another attorney.

Over a month later, on July 9, defendant's trial began with Fratto still acting as defendant's attorney. After a three-day trial, the jury returned verdicts of guilty on all counts. Defendant now appeals.

## ANALYSIS

Defendant challenges his convictions by asserting two main arguments on appeal: (1) he received ineffective assistance of counsel and (2) the trial court erroneously denied his motion to sever the murder charge from the theft charges. We review each of these arguments in turn.

### I. Effectiveness of Counsel's Assistance

We first examine defendant's argument that he was denied the effective assistance of counsel. Defendant specifically complains that the deterioration of his relationship with Fratto required the trial court to grant Fratto's motion to withdraw, and that the denial of Fratto's motion, and Fratto's subsequent continued representation of defendant, denied defendant his right to counsel.

■ Whether to allow an indigent defendant's attorney to withdraw after the attorney has expressed concern about his or her relationship with the defendant is a matter committed to the trial court's sound discretion and will be reversed only for an abuse of discretion. *See* Utah Code Jud. Admin. R4–604(1)(A) (stating attorney may not withdraw as counsel of record in criminal case without court's approval); *cf. State v. Wulffenstein,* 733 P.2d 120, 121 (Utah 1986) (per curiam) ("Whether the accused's grievances with appointed counsel justify appointment of another attorney is within the sound discretion of the trial court."); *State v. Pursifell,* 746 P.2d 270, 272 (Utah.Ct.App.1987) (stating "[w]hether to appoint a different lawyer for an indigent defendant who expresses dissatisfaction with his court-appointed counsel, but who has no constitutional right to appointment of a different attorney," is "a matter committed to the sound discretion of the trial court and will be reversed only for an abuse of discretion"). However, courts, of course, have no discretion to allow a violation of a defendant's constitutional right to counsel. *See id.* at 274.

To better understand defendant's argument, we first turn to Fratto's affidavit, which Fratto submitted to support his motion

to withdraw. In his affidavit, Fratto itemized the circumstances evidencing defendant's refusal to cooperate with him and described the resultant deterioration of their relationship. For example, Fratto testified that defendant had complained to the Utah State Bar that Fratto had conspired with the prosecutor to have defendant committed to the Utah State Hospital for evaluation; that defendant, independently of Fratto, had requested a change of venue; and that defendant had refused Fratto's request for an interview. Each of the circumstances itemized by Fratto in the affidavit were examples of defendant's refusal to cooperate with and animosity toward Fratto. Based on these experiences with defendant, Fratto concluded in his affidavit that his relationship with defendant had deteriorated, and because of that deterioration, Fratto wished to withdraw as defendant's counsel.

Now on appeal, defendant points to the circumstances outlined in Fratto's affidavit as evidence that defendant's relationship with Fratto had deteriorated to such a point that the trial court was constitutionally obligated to grant Fratto's motion to withdraw. Defendant argues that by not granting Fratto's motion to withdraw and by requiring Fratto's continued representation of defendant, the trial court denied defendant his constitutional right to counsel.[2] Defendant argues, "[I]t matters not who was to blame [for the breakdown in defendant and Fratto's relationship], or who was right or wrong. Perhaps [defendant] was wrong or mistaken.... It matters not." Therefore, in analyzing defendant's argument, we examine whether a trial court is constitutionally required to appoint new counsel for an indigent defendant when the defendant's relationship with appointed counsel has deteriorated. Specifically, due to the facts of this case, we examine whether the trial court must substitute counsel regardless of who is to "blame," as defendant puts it, for the deterioration in the attorney-client relationship.

■ Our examination of Utah law reveals that defendant's argument is erroneous. In fact, our examination reveals that the cause of the breakdown—or who is to "blame"—in an attorney-client relationship significantly affects whether the breakdown constitutionally requires the court to substitute a defendant's court-appointed counsel. Under established law, an indigent defendant does not have a right under either the United States or the Utah Constitution to reject court-appointed counsel in order to force the court to appoint new counsel unless the defendant shows "good cause." *See Wulffenstein,* 733 P.2d at 121. To successfully show "good cause" for rejecting court-appointed counsel, a defendant must meet a heavy burden. A defendant must do more than show that he or she does not have a "meaningful relationship" with his or her attorney. *See id.* Moreover, "[t]he fact that a defendant does not get along with his [or her] attorney does not, standing alone, establish a denial of the effective assistance of counsel." *Gardner v. Holden,* 888 P.2d 608, 622 (Utah 1994) (plurality opinion), *cert. denied,* —— U.S. ——, 116 S.Ct. 97, 133 L.Ed.2d 52 (1995). Instead, to establish "good cause" for rejecting a court-appointed attorney, a defendant "must also establish that the animosity [between the defendant and his or her attorney] resulted in such a deterioration of the attorney-client relationship that the right to the effective assistance of counsel was imperiled." *Id.; see also Pursifell,* 746 P.2d at 274 ("Substitution of counsel is mandatory when the defendant has demonstrated good cause, such as a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict with his or her attorney.").

■ However, such intense animosity must have a legitimate basis to constitute "good cause" for a defendant's rejection of a court-appointed attorney. To result in the denial of a defendant's right to counsel, such animosity may not be based solely on the defendant's illegitimate complaints or subjective perception of events. *See Pursifell,* 746 P.2d at 274 ("Though the motion might have

---

2. We note that defendant does not allege, as did the defendant in *State v. Pursifell,* 746 P.2d 270 (Utah.Ct.App.1987), that the trial court failed to make a reasonable inquiry into Fratto's or defen-

dant's complaints. *See id.* at 272–74. We therefore presume that the trial court's inquiry into Fratto's and defendant's complaints was sufficient.

been subjectively important to defendant, '[g]ood cause for substitution of counsel cannot be determined "solely according to the subjective standard of what the defendant perceives." ' " (citations omitted)).

Turning again to defendant's case, we recognize that the trial court determined whether defendant had "good cause" for rejecting Fratto's assistance by refusing to cooperate with him. After holding a hearing on Fratto's motion to withdraw, the trial court noted—consistent with Fratto's affidavit—that defendant did not wish to speak or cooperate with Fratto. Nevertheless, the court denied Fratto's motion because it found, among other things, that defendant had no legitimate basis for refusing to cooperate with Fratto. Because the lack of a legitimate basis for rejecting a court-appointed attorney does not constitute "good cause," *see id.*, the trial court essentially ruled with this finding of "no legitimate basis" that defendant did not have "good cause" to reject Fratto as his counsel.

■ Although the transcript of the hearing on Fratto's motion to withdraw, with which defendant has not provided us, would be helpful to our review of the trial court's finding of "no legitimate basis," Fratto's affidavit sufficiently supports the finding. Like the trial court's finding, Fratto's affidavit recognizes defendant's refusal to cooperate with Fratto. In addition, the affidavit provides evidence that it was *defendant's* refusal to cooperate with Fratto that caused defendant's relationship with Fratto to deteriorate. Moreover, Fratto's affidavit evidences that it

was defendant's refusal to cooperate with and obvious animosity toward Fratto that prompted Fratto to move to withdraw as defendant's counsel. However, as Fratto's affidavit suggests, defendant's refusal to cooperate was grounded in his erroneous and subjective perception of events.[3] As such, we conclude the trial court's finding that "no legitimate basis" existed for defendant's refusal to cooperate is well supported by the record.

Because defendant's refusal to cooperate with Fratto had no legitimate basis, we conclude defendant did not have "good cause" to reject Fratto as his counsel by not cooperating with him. *See id.* Defendant does not allege any specific, "identified acts or omissions" in Fratto's performance that fall "outside the wide range of professionally competent assistance." *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). Instead, defendant bases his entire argument on the general breakdown in their attorney-client relationship. As a result, defendant's argument lacks the requisite basis—a showing of "good cause"— to successfully argue that he received ineffective assistance of counsel.

Because "good cause" did not exist for defendant's refusal to cooperate with Fratto, we conclude that defendant did not receive ineffective assistance of counsel[4] and that the trial court did not abuse its discretion by denying Fratto's motion to withdraw.[5]

## II. Denial of Motion to Sever

■ We next examine defendant's argument that the trial court erroneously denied

3. In addition, defendant's counsel stated in his oral argument that defendant was mistaken in his belief that Fratto had conspired with the prosecutor to have him committed to the Utah State Hospital for evaluation.

4. Furthermore, we note that subsequent parts of the record contradict defendant's argument that he received ineffective assistance of counsel. After denying Fratto's motion to withdraw, the trial court granted a continuance, moving the trial date from May 29, 1996, to July 9, 1996. The trial court moved the date to allow Fratto to prepare for trial, a delay that allowed defendant the opportunity to change his behavior and cooperate with Fratto. The record then shows that Fratto appeared at defendant's trial and represented him.

Moreover, the record suggests defendant and Fratto had begun communicating by the time the trial occurred. After announcing to the trial court defendant's intention not to testify, Fratto explained that defendant, "in consultation with me, and understanding of the situation, has voluntarily and knowingly chosen not to testify." Furthermore, defendant also affirmed that Fratto "had asked [defendant] some questions about [him] making that decision [not to testify] knowingly and intelligently."

5. Defendant has also argued on appeal that the trial court failed to obtain a knowing and intelligent waiver of defendant's right to counsel. However, because we have concluded that defendant was represented by counsel, we summarily reject this argument.

his motion to sever the murder charge from the theft charges. Because the trial court has discretion to grant or deny a severance request, we will "reverse a conviction only if the trial judge's refusal to sever charges 'is a clear abuse of discretion in that it sacrifices the defendant's right to a fundamentally fair trial.'" *State v. Lopez*, 789 P.2d 39, 42 (Utah.Ct.App.1990) (quoting *State v. Pierre*, 572 P.2d 1338, 1350 (Utah 1977)).

Section 77–8a–1 of the Utah Code governs both when a trial court may allow a defendant to be tried for more than one offense in the same trial and when a trial court must order separate trials for different offenses. Specifically, section 77–8a–1 states, in relevant part:

> (1) Two or more felonies, misdemeanors, or both, may be charged in the same indictment or information if each offense is a separate count and if the offenses charged are:
>
>> (a) based on the same conduct or are otherwise connected together in their commission; or
>>
>> (b) alleged to have been part of a common scheme or plan.
>
> . . . .

(3) (a) The court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants, if there is more than one, could have been joined in a single indictment or information.

(b) The procedure shall be the same as if the prosecution were under a single indictment or information.

(4) (a) If the court finds a defendant or the prosecution is prejudiced by a joinder of offenses or defendants in an indictment or information or by a joinder for trial together, the court shall order an election of separate trials of separate counts, grant a severance of defendants, or provide other relief as justice requires.

Utah Code Ann. § 77–8a–1(1), (3), (4)(a) (1995).[6]

■ Therefore, to decide whether the trial court abused its discretion by denying defendant's motion to sever, we examine whether the trial court complied with section 77–8a–1. To determine whether the trial court complied with section 77–8a–1, we must interpret it according to the common meaning of its

---

6. In arguing that the trial court improperly refused to sever the murder and theft charges, defendant refers to Rule 9.5 of the Utah Rules of Criminal Procedure. Rule 9.5 provides, in relevant part:

> (1)(a) Unless otherwise provided by law, complaints, citations, or informations charging multiple offenses, which may include violations of state laws, county ordinances, or municipal ordinances and arising from a single criminal episode as defined by Section 76–1–401, *shall* be filed in a single court that has jurisdiction of the charged offense with the highest possible penalty of all the offenses charged.
> (b) The offenses within the complaint, citation, or information may not be separated except by order of the court and for good cause shown.

Utah R.Crim. P. 9.5(1)(a)-(b) (emphasis added). Section 76–1–401, which defines a single criminal episode, provides:

> In this part unless the context requires a different definition, "single criminal episode" means all conduct which is closely related in time and is incident to an attempt or an accomplishment of a single criminal objective. *Nothing in this part shall be construed to limit or modify the effect of Section 77–8a–1 in controlling the joinder of offenses and defendants in criminal proceedings.*

Utah Code Ann. § 76–1–401 (Supp.1997) (emphasis added). Defendant argues, citing to Rule 9.5, that to be properly joined, the murder and theft charges had to be part of a single criminal episode, as defined by section 76–1–401.

However, Rule 9.5 only dictates when informations charging multiple offenses arising from a single criminal episode *must be joined*. It does not address either when the trial court *may join* charges or when charges *must be severed*. On the other hand, section 77–8a–1 addresses both when a trial court may order that two offenses be tried in a single trial and when the trial court must order that two offenses be tried in separate trials. In this case, we do not address whether the trial court was required to join the charges. Instead, we examine whether the trial court was allowed to order a single trial for the murder and theft charges and whether the trial court, given the circumstances of the case, was required to order separate trials for the two different charges. Therefore, section 77–8a–1, rather than Rule 9.5 and section 76–1–401, governs the issues before us. Furthermore, the second paragraph of section 76–1–401 specifically indicates that section 77–8a–1 controls the joinder of offenses in criminal proceedings. Consequently, we base our analysis on section 77–8a–1.

plain language. *See Newspaper Agency Corp. v. Auditing Div.*, 938 P.2d 266, 270–71 (Utah 1997); *Moreno v. Board of Educ.*, 926 P.2d 886, 889 (Utah 1996).

The language of section 77–8a–1 is clear. Under subsections (1) and (3), a trial court may order that a defendant be tried for different offenses in a single trial if the offenses either are (1) "based on the same conduct or are otherwise connected together in their commission," or (2) "alleged to have been part of a common scheme or plan." Utah Code Ann. § 77–8a–1(1)(a), (b) (1995). Therefore, the first part of our analysis must focus on whether defendant's murder and theft counts either were connected together in their commission or were alleged to be part of a common scheme or plan.

If we determine that the offenses either were connected together in their commission or were alleged to be part of a common scheme or plan, we must then examine whether the trial court complied with subsection (4)(a). Under that subsection, even if the trial court could order a single trial of the different offenses under subsections (1) and (3), if a single trial would result in prejudice to the defendant, the trial court would be required to order separate trials. Therefore, the second part of our analysis must focus on whether the single trial of the murder and theft charges resulted in prejudice to defendant.

### A. "Connected Together in their Commission" or "Alleged to be Part of a Common Scheme or Plan"

■ Our examination of the evidence presented at trial and of the State's theory of the case convinces us that the murder and theft counts both were connected together in their commission and were alleged to be part of a common scheme or plan. The evidence indicates that defendant's purpose in taking both Kayleen's grandmother's car and Wade's firearms was to facilitate defendant's flight from the scene of the murder. The car provided him with his transportation, and the firearms—as he sold them—provided him

with money to finance his flight. Defendant also took and sold the Ruger .22, perhaps to dispose of the murder weapon. Because the evidence indicates that the purpose behind all five thefts was to enable defendant's flight from the murder, we conclude that a direct relationship exists between the murder charge and the theft charges. *Cf. United States v. Quinones*, 516 F.2d 1309, 1312 (1st Cir.1975) (concluding that fourth count was "a direct result of the happenings charged in the [initial three] counts"). That is, we conclude that the conduct resulting in the theft charges was precipitated by defendant's conduct resulting in the murder charge, and consequently the theft and murder charges were sufficiently "connected together in their commission" to allow the trial court to order a single trial of the different offenses. Utah Code Ann. § 77–8a–1(1)(a) (1995); *see State v. Smith*, 927 P.2d 649, 653 (Utah.Ct.App. 1996), *cert. denied*, 937 P.2d 136 (Utah 1997).

Furthermore, this interpretation of the evidence closely follows the State's theory of the case. The State alleged that defendant's objective in committing the thefts was to provide him with transportation, to finance his flight, and to dispose of the murder weapon after he murdered Kayleen. Thus, we also conclude that the State had "alleged" that the murder and thefts were "part of a common scheme or plan."

Therefore, the murder and theft charges were connected together in their commission and were alleged to be part of a common scheme or plan. As a result, the trial court was allowed to order a single trial of the murder and theft charges under section 77–8a–1(1).[7]

### B. Prejudice

■ Because we have concluded the murder and theft counts were connected together in their commission and were alleged to be part of a common scheme or plan, we next address whether the single trial of the murder and theft charges prejudiced defendant. *See* Utah Code Ann. § 77–8a–1(4)(a) (1995).

---

7. Defendant was charged with all five counts under a single information. Therefore, section 77–8a–1(3) does not apply to this case.

After examining the evidence presented at trial, we conclude defendant was not prejudiced by the single trial because overwhelming evidence was presented that supported both the murder and theft counts.

The evidence at trial strongly supports the murder count. The evidence establishes that defendant was loaned the Ruger .22, which was used to kill Kayleen, before the murder occurred, and that defendant took the Ruger .22 when he left for Nevada on Monday morning. The evidence also clearly establishes that Kayleen had been shot before defendant left. In addition, defendant was in the trailer getting Wade's four firearms after he "borrowed" the Monte Carlo and just before he left for Nevada, indicating that he knew Kayleen had been shot. Other evidence also supports the murder charge. No signs of a struggle or a forced entry were found in the trailer. Kayleen did not have any defensive wounds and was shot five or six times in the head through two pillows, suggesting she was murdered while she either was sleeping or resting on the bed. In addition, defendant was the only person known to be in the trailer with Kayleen before he left in the Monte Carlo. This evidence, combined with the other evidence at trial that was unrelated to the theft charges, overwhelmingly supports the murder charge against defendant. The evidence establishes that defendant was with Kayleen before she died and that he had access—and probably exclusive access—to the murder weapon. Moreover, defendant's intent to knowingly and intentionally kill Kayleen, to cause serious bodily injury to her by committing an act clearly dangerous to her life, or to act with depraved indifference to her life, *see* Utah Code Ann. § 76–5–203(1)(a)–(c) (Supp.1997), may easily be inferred from the fact that Kayleen was shot repeatedly through two pillows while she was apparently sleeping or resting. *See State v.*

*Emmett*, 839 P.2d 781, 784 (Utah 1992) (stating intent may be inferred from facts and circumstances surrounding crime). Because overwhelming evidence supporting the murder charge was presented at trial, we conclude the introduction of the evidence supporting the theft charges was not prejudicial as it related to defendant's murder charge.[8]

Overwhelming evidence supporting the theft charges was also presented at trial. This evidence established that defendant, under false pretenses, obtained permission to take the Monte Carlo and then drove it much farther than he was given permission. Furthermore, the evidence strongly suggested that defendant had no intention of returning the Monte Carlo to Kayleen's grandmother. In addition, the evidence established that Wade loaned defendant the Ruger .22 for the exclusive purpose of shooting the rat in the storage tank. However, instead of shooting the rat and returning it, defendant took the Ruger .22 to Nevada and sold it for $25. The evidence also established that defendant, without permission, took to Nevada Wade's two .22 rifles and Wade's 30–06 that were kept hidden in the trailer and tried to sell all three, but had sold only the 30–06 when he was apprehended. We find this evidence to be overwhelmingly supportive of the theft charges against defendant because it solidly proves defendant "obtain[ed] and exercise[d] unauthorized control over the property of another with a purpose to deprive him [or her] thereof." Utah Code Ann. § 76–6–404 (1995). Consequently, we conclude the evidence supporting the murder charge was not prejudicial as it related to defendant's theft charges.

In summary, because the murder and theft charges were "connected together in their commission" and were "alleged to be part of a common scheme or plan," and because their joinder did not prejudice defendant, we conclude the trial court did not abuse its

---

8. Defendant also argues on appeal that insufficient evidence was presented at trial to support the jury's verdict convicting him of murder. We will reverse a criminal case for insufficient evidence only when the evidence, when viewed in the light most favorable to the jury's verdict, "is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v. Dunn*, 850 P.2d 1201, 1212 (Utah 1993). As we have discussed, the evidence presented at trial strongly supported the murder charge. Therefore, we reject defendant's insufficient evidence argument.

discretion by denying defendant's severance motion.

## CONCLUSION

We conclude defendant was not denied the effective assistance of counsel. No legitimate basis existed for defendant's refusal to cooperate with Fratto, and consequently, defendant did not have "good cause" to reject Fratto's assistance by refusing to cooperate with him.

We also conclude the trial court did not abuse its discretion by denying defendant's motion to sever. The murder and theft charges both were connected together in their commission and were alleged by the prosecution to be part of a common scheme or plan. In addition, defendant was not prejudiced by a single trial because overwhelming evidence was presented at trial that supported both the murder and theft charges.

Affirmed.

BILLINGS, J., concurs.

ORME, J., concurs in Part II and the result in Part I.