2013 UT App 39

# THE UTAH COURT OF APPEALS

STATE OF UTAH,

*Plaintiff and Appellee,*

*v.*

JULIO I. MARTINEZ,

*Defendant and Appellant.*

Memorandum Decision
No. 20110015-CA
Filed February 22, 2013

Third District, Salt Lake Department
The Honorable Deno G. Himonas
No. 091903723

Samuel P. Newton, Attorney for Appellant
John E. Swallow and Christine F. Soltis, Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Memorandum Decision,
in which JUDGE J. FREDERIC VOROS JR. concurred.
JUDGE WILLIAM A. THORNE JR. dissented, with opinion.

ORME, Judge:

¶1      Defendant argues that his convictions should be vacated and a new trial ordered because his trial attorneys labored under a conflict of interest that adversely affected their performance in representing him. Defendant also contends that the trial court improperly denied his motions to appoint new counsel and failed to adequately inquire into the nature of the conflict between Defendant and his counsel. We affirm.

¶2 Defense counsel's efforts on Defendant's behalf appear to have been quite thorough. In the months leading up to trial, Defendant's attorneys requested discovery, a bail hearing, and Defendant's release from incarceration so he could attend a funeral; represented Defendant at a preliminary hearing and his arraignment; attended a scheduling conference; moved for the discovery of and subpoenaed the victim's Division of Child and Family Services (DCFS) records; provided notice of self-defense, as required by statute; and moved to continue the trial to allow for additional defense investigation.

¶3 Despite defense counsel's efforts, two months before trial Defendant filed a pro se motion requesting new counsel. Defendant claimed that his attorneys were not communicating with him and that they had failed to obtain "medical" records, apparently referring to the DCFS records. The trial court held a hearing to discuss Defendant's motion, and the court questioned Defendant about his concerns. Defendant complained that his attorneys had not moved to suppress a statement that his father had made to police. Counsel replied that they had reviewed the statement but believed that there was no good faith basis on which to argue that the statement should be suppressed. They also noted that the prosecution did not intend to introduce the statement at trial. The trial court determined that there was no reason to suppress the statement and, consequently, found that there was no good cause to appoint new counsel on this basis.

¶4 Regarding Defendant's claim that his attorneys' communication with him was inadequate, defense counsel explained that they maintained records of all jail visits and had been visiting Defendant more often than their other jailed clients—about three out of four weeks per month, for fifteen minutes to an hour per visit. As to Defendant's complaint that defense counsel had not secured the victim's DCFS records, counsel explained that efforts to secure the records were ongoing and being litigated. The trial court found defense counsel's explanations satisfactory. The court confirmed that Defendant had

no other concerns or complaints. The court informed Defendant that if he had concerns in the future he should come forward with them, but it concluded that there was "absolutely no basis for replacing counsel" at that time.

¶5    Defense counsel's continued diligence on behalf of Defendant is demonstrated by their pretrial motion to sever count two, robbery, from the other counts. Although the motion was denied, the court directed the State not to elicit evidence at trial about either the underlying theft or Defendant's gang affiliations. The court also granted a defense motion forbidding any reference to the victim as a "victim." Defense counsel asked the court to prohibit an officer from testifying at trial that the victim was in condition "delta"—one step short of death—when the officer arrived on the scene. The trial court denied that motion.

¶6    Defense counsel's diligent efforts on Defendant's behalf continued at trial. The introduction of a taped telephone call from Defendant, while in jail, to the victim was delayed until the defense had an opportunity to review it. Although overruled by the court, an objection to a jury instruction was interposed by defense counsel. After the State's direct examination of its second witness, a convenience store clerk, defense counsel informed the court, outside the presence of the jury, that Defendant wanted to know whether a plea offer was still "on the table." Upon discussing the available offer with counsel, Defendant rejected it, and the trial continued.

¶7    Defense counsel then cross-examined the clerk, who testified that he had seen Defendant in the store on other occasions but did not know his name and had not previously conversed with him. As one of his attorneys questioned the clerk, Defendant passed her a note. Counsel then asked the clerk if he had testified at Defendant's preliminary hearing that he and Defendant had engaged in "dozens" of conversations in the past. The prosecution objected that this was a misstatement of the prior testimony. When defense counsel asked to withdraw the question, the court refused and

directed counsel to read the relevant portion of the preliminary hearing transcript aloud. The thrust of the testimony was that the clerk had only seen or waited on Defendant on several prior occasions but had not otherwise interacted with him. The court then admonished defense counsel for improper impeachment of the witness.

¶8     After the jury was excused that day, the court scolded defense counsel again about the improper impeachment effort. Defendant injected himself into the conversation and began to argue with the court, insisting that the store clerk's earlier testimony differed from his trial testimony, contending, "It says it right here on the preliminary transcripts." The court cut Defendant off, telling him that his attorneys could explain why the impeachment was improper. Defendant replied, "Well, I think I'm going to file an ineffective assistance of counsel on me then because you're not representing—you are not representing—you are not going right through the—." The court then asked both defense attorneys if the store clerk had previously testified to having dozens of conversations with Defendant. Both replied that he had not.

¶9     That evening, defense counsel contacted the presiding judge of the district to discuss "an issue of concern." They explained that they felt "a sense of intimidation" and "couldn't really articulate what it was, but that there was a sense of being compromised in the ability to exercise a judgment they normally exercise or to make a decision they would normally make." The defense attorney who had undertaken the improper impeachment after being prompted by Defendant's note explained that the sense of intimidation had caused her to do "something . . . that day . . . that was against an old judge that she normally would not have done." The presiding judge telephoned the trial judge to inform him of the conversation.

¶10     The next morning, with all counsel present, the court disclosed in chambers that defense counsel had engaged in an ex parte communication with the presiding judge. Defense counsel

reiterated that "there's just something about this particular individual that raises concerns to us." The court stated:

> It's your duty adequately and zealously to represent him. And it sounds to me, you correct me if I am wrong, it's not that you are foregoing legitimate cross-examination, . . . it's that perhaps his intimidation has led you to do things that would otherwise be against your professional judgment.

Counsel replied, "That's accurate, your Honor." The court, in reference to the prior improper impeachment, said:

> My sense right now . . . it's more of . . . intimidation, but that's not the point. And if that's the case, . . . my initial reaction is, forgive me saying this a little bit, but it's—you've got a duty to your client and you're also an officer of the Court. And at some point you just call, excuse my French, bullshit, and you don't do things like last night. Right?

The court then called a recess to allow the attorneys to talk. After the break, the State indicated its belief that defense counsel would represent Defendant "with the integrity of court officers and do their job like they should." Defense counsel agreed that they were ready to continue with the trial.

¶11    Back in the court room, but without the jury present, the court told Defendant what had been discussed in chambers. The court informed Defendant that his reaction to the court's ruling regarding the previous day's impeachment had been improper. Defendant initially agreed, stating that perhaps his counsel had misunderstood the questions that he had wanted asked, but he later began to argue, insisting that the convenience store clerk *had* testified differently at trial than he had previously.

¶12   The court also addressed the intimidation concerns, explaining:

> I've been informed by your counsel that they feel intimidated by you, whether rightfully or wrongfully, . . . and they have disclosed that intimidation and that has perhaps caused them to do things that they would not otherwise do as officers of the Court. . . . We're going to go forward with this trial. Okay?

¶13   Defendant then stated, "Well, I'm already going to fill out a motion to—file for a new counsel based on integrity of counsel . . . ." Defendant summarized the basis for his renewed motion in these terms:

> My lawyers, they feel intimidated by me, so, therefore, we have a conflict of interest. So therefore, they feel they are afraid of me or whatever their complaints would be. So, therefore, there's a conflict between me and the lawyers. So, therefore, I don't see how we can, you know, communicate without me feeling that there's a fear between me and them.

In response, both defense attorneys again indicated that they could "vigorously represent" Defendant. The court told Defendant, "I don't think that you get to recreate the situation in which you get new counsel by doing that," i.e., by intimidating appointed counsel.

¶14   Defendant then argued again why he felt that replacement counsel was necessary. He first claimed that his lawyers had failed to suppress his father's statement—which was not admitted at trial—but that claim had earlier been considered and rejected by the court. Defendant also claimed that his attorneys had not informed him that a severance motion had been denied and insisted he was not present when the motion was argued and

decided. Both attorneys responded that Defendant had been present, whereupon the court told Defendant, "Stop pulling my leg then[.]" Defendant admitted he had forgotten that he had been present and asked to withdraw his motion for substitution of counsel, stating that he would "agree to go forward with this counsel." The court responded, "I'm not giving you a choice. Your motion is denied." As the court attempted to go on, Defendant accused the court of "violating [his] constitutional rights." Defendant then "stare[d] down" the judge. The judge told Defendant, "I've tried . . . a couple of hundred jury cases, and I'm telling you that you are being as difficult a defendant as any I have encountered[.]"

¶15     As the trial continued, defense counsel actively objected to evidence and cross-examined witnesses. Defense counsel twice moved for a mistrial after the bailiff overheard two jurors discussing why additional deputies were in the courtroom and heard one juror comment that it was so Defendant could be detained if convicted. Defense counsel opposed any questioning of the individual jurors or the use of a curative jury instruction out of concern for calling more attention to the matter. The court denied the motions for mistrial and reaffirmed the denial when the motion was again renewed.[1] The defense moved unsuccessfully for a directed verdict on the attempted murder charge, claiming that there was insufficient evidence to convict Defendant on the "intentional" or "knowing" element of the crime.

¶16     Outside the presence of the jury, defense counsel told the court that they had explained to Defendant that he had a right to testify and that he had opted not to do so. The court questioned Defendant to ensure that his choice was informed, that he had had

---

[1]The juror who made the comment was later removed from the jury at defense counsel's request and replaced with an alternate.

adequate time to consult with his counsel, and that he understood the consequences of not testifying.

¶17     In closing argument, defense counsel argued that Defendant truly lacked the intent to kill the victim despite his stated intention to do so. Counsel argued that the attempted murder count was the result of overzealous charging by the State and urged the jury to instead find Defendant guilty of a lesser included offense.

¶18     Defense counsel admitted that Defendant was guilty of domestic violence in the presence of children but argued that the violence was perpetrated in the course of an assault rather than an attempted murder. Defense counsel also admitted that Defendant was guilty of interference with a lawful arrest but forcefully argued that he should be acquitted of robbery due to the store clerk's lack of credibility. The jury acquitted Defendant of the charge of attempted murder, finding him guilty instead of the lesser included offense of aggravated assault, but convicted him of the remaining charges.

¶19     The day after trial, in a telephone conference with the prosecution and defense counsel, the trial judge explained that he had learned from a credible source that one of Defendant's attorneys "was, not last night but the night before, followed home and had to alert the authorities." The attorney confirmed that she had called the police after being followed home. The court stated that it felt obligated to disclose the matter.

¶20     Two weeks after trial but prior to sentencing, Defendant's attorneys withdrew and new counsel was appointed to represent Defendant. New counsel moved to recuse the trial judge from the sentencing phase, but the motion was denied. New counsel moved for a new trial, claiming that both of Defendant's trial attorneys were ineffective. New counsel later rescinded that motion. New counsel withdrew after sentencing, and Defendant's appellate counsel was appointed.

¶21    On appeal, Defendant asserts that his convictions should be vacated and a new trial ordered because his trial attorneys felt intimidated by him and, therefore, a conflict of interest existed. Whether an actual conflict existed is a mixed question of fact and law. *See State v. Lovell*, 1999 UT 40, ¶ 22, 984 P.2d 382. "First, we review the district court's factual conclusions under a clear error standard. Second, we review the district court's legal interpretation of particular ethical norms under a de novo standard when that interpretation implicates important constitutional rights." *State v. Balfour*, 2008 UT App 410, ¶ 11, 198 P.3d 471 (citation and internal quotation marks omitted).

¶22    We first consider whether an actual conflict existed between Defendant and his trial counsel. Absent proof that an actual conflict existed, we review a trial court's refusal to appoint new counsel under an abuse of discretion standard, *see State v. Scales*, 946 P.2d 377, 381 (Utah Ct. App. 1997), and Defendant argues that, at a minimum, the trial court erred in denying his motions for substitution of counsel.

¶23    An indigent defendant has a right to have counsel appointed to represent him at public expense, *Gideon v. Wainwright*, 372 U.S. 335, 344–45 (1963), and the Sixth Amendment guarantees defendants the right to effective assistance from such counsel, *see Strickland v. Washington*, 466 U.S. 668, 688–89 (1984). This means that defense counsel must reasonably assist the defendant in receiving a fair trial. *Id*.

¶24    "The accused is entitled to the assistance of a competent member of the Bar, who demonstrates a willingness to identify himself with the interests of the defendant and who will assert such defenses as are available to him under the law and consistent with the ethics of the profession." *State v. Classon*, 935 P.2d 524, 533–34 (Utah Ct. App. 1997) (citation and internal quotation marks omitted). However, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. If counsel is a reasonably effective advocate, he

meets constitutional standards irrespective of his client's evaluation of his performance." *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984). The right to counsel is not subject to the defendant's unfettered preference. "Trial courts are generally allowed considerable discretion in granting or denying motions to disqualify counsel, and such decisions will only be overturned when that discretion is exceeded." *Balfour*, 2008 UT App 410, ¶ 11.

¶25    Because Defendant's attorneys were "intimidated" by him, Defendant claims that they acted under a conflict of interest, particularly with regard to the duty of loyalty. Quoting *Strickland*, Defendant claims that "this 'duty of loyalty' has been described as 'perhaps the most basic of counsel's duties.'" 466 U.S. at 692. "[E]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond a reasonable doubt." *Cronic*, 466 U.S. at 656 n.19. "Of course, the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Id.*

¶26    Defendant claims that the "animosity between Defendant and his trial counsel resulted in the deterioration of the attorney-client relationship to the point that it affected Defendant's right to effective assistance of counsel." We disagree. From an objective perspective, defense counsel continued to zealously represent Defendant, *despite* Defendant's complaints and apparent efforts at intimidation. Although for a very brief time defense counsel doubted their ongoing ability to represent Defendant, defense counsel was always commendably cognizant of their obligation to "adequately and zealously represent [Defendant] in trial" "with the integrity of court officers and do their job like they should."[2]

---

[2]We also note that the improper impeachment of the

(continued...)

¶27 Defendant claims on appeal that defense counsel's agreement to represent Defendant after feeling intimidated by him "clearly would affect not only a defendant's ability to communicate with his counsel, but would also affect counsel's willingness and desire to act with the duty of loyalty." It is not disputed that Defendant was a difficult and intimidating client. As noted, the trial court even went so far as to tell Defendant, "I've tried . . . a couple of hundred jury cases, and I'm telling you that you are being as difficult a defendant as any I have encountered[.]" However, once counsel voiced their concerns and determined that they could continue to zealously represent their client, counsel did so until the conclusion of trial.[3]

---

[2](...continued)
convenience store clerk on the first day of trial does not suggest a conflict of interest. The attempted impeachment was not adverse to Defendant's interests but was at his specific request. *See State v. Webb*, 790 P.2d 65, 75 (Utah Ct. App. 1990) ("In order to show an actual conflict of interest existed, a defendant must point to specific instances in the record to suggest an actual conflict or impairment of his or her interests.") (citations omitted).

[3]Defendant additionally claims that counsel's disclosure of the intimidation may have been a violation of the Utah Rules of Professional Conduct. *See* Utah R. Prof'l Conduct 1.6 (relating to permissible attorney disclosures of information related to the client); *id.* R. 1.7 (stating that a lawyer "shall not represent a client if the representation of that client may be materially limited . . . by the lawyer's own interest"). However, defense counsel, mindful of their obligations to their client, limited their disclosures to the court and, indeed, directed them initially to the presiding judge. One of the attorneys acknowledged the need to "continue to zealously represent our defendant. And because of that I can't disclose certain information." The court

(continued...)

¶28 Defendant claims that his counsel's closing argument, in which counsel conceded Defendant's guilt to some charges, indicated a clear breakdown in the attorney-client relationship. We disagree. Attempted murder was by far the most serious charge Defendant faced at trial. Counsel may very well have made the tactical decision to admit guilt to the lesser offenses, on which the State had presented extensive evidence, and instead focus their efforts on seeking acquittal on the most serious charge. "[D]efense tactics, whereby counsel admits guilt on a lesser charge in the hope that the jury would then be more receptive to the claim that the defendant was innocent of the far more serious offense and acquit him thereof, is a perfectly acceptable strategy which should not be second guessed by the courts." *People v. Allen*, 727 N.Y.S.2d 331, 331–32 (App. Div. 2001) (mem.) (alterations, citations, and internal quotation marks omitted).

¶29 Defendant has not demonstrated how counsel failed to represent his best interests at trial.[4] Therefore, we are not persuaded that defense counsel actually labored under a conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his

---

[3](...continued)
then informed Defendant on the record of these discussions, outside the presence of the jury.

[4]Defendant claims that counsel's withdrawal prior to sentencing "indicates the severity of the conflict and that an actual conflict existed from the moment of disclosure until well after trial." This is not the case. As explained to Defendant during trial, defense counsel had a general policy to withdraw from a case after trial in instances where doing so might facilitate the assertion of an ineffective assistance claim.

claim of ineffective assistance.”). Defendant's claim for ineffective assistance therefore fails.

¶30 We next address whether the trial court adequately inquired into Defendant's complaints regarding his trial counsel. “[W]hen a defendant expresses dissatisfaction with counsel, a trial court must make some reasonable, non-suggestive efforts to determine the nature of the defendant's complaints.” *State v. Pando*, 2005 UT App 384, ¶ 24, 122 P.3d 672 (citations and internal quotation marks omitted) (alteration in original). The court should “apprise itself of the facts necessary to determine whether the defendant's relationship with his . . . appointed attorney has deteriorated to the point that sound discretion requires substitution or even to an extent that his . . . right to counsel would be violated but for substitution.” *State v. Pursifell*, 746 P.2d 270, 273 (Utah Ct. App. 1987).

¶31 Defendant contends that the trial court perfunctorily dismissed his renewed motion to substitute counsel on the second day of trial and should have inquired more fully. However, Defendant's midtrial complaint about his counsel was essentially a reiteration of the arguments he had made when asking for new counsel prior to trial. The court recognized as much when it indicated to Defendant that it had already denied his motion for new counsel. After admitting that he forgot that he had been present when the motion to sever had been argued and decided, Defendant stated, “I'll agree to go forward with this counsel.” Defendant's argument for renewing the motion was that his lawyers felt intimidated by him and that he felt this created a conflict of interest that affected their ability to communicate with each other. The court asked both defense attorneys if they were able to “vigorously represent” Defendant; they responded affirmatively. And their actions throughout trial, outlined in some detail above, speak louder than their words. We therefore conclude that the trial court was adequately apprised of Defendant's complaints before denying Defendant's motion for new counsel.

¶32    Because we determine that Defendant's attorneys did not have a conflict of interest and that the trial court adequately inquired into Defendant's dissatisfaction within his counsel, we review the court's ultimate denial of his motion for substitution of counsel only for an abuse of discretion. *See State v. Scales*, 946 P.2d 377, 381 (Utah Ct. App. 1997). We conclude that the trial court was well within its discretion in denying Defendant's request for the appointment of new counsel.

¶33    Affirmed.

————————

THORNE, Judge (dissenting):

¶34    I respectfully dissent from the majority's decision determining that the trial court was adequately apprised of Defendant's complaints before it denied Defendant's motion for substitution of counsel. The trial court's failure to further inquire into and fully inform Defendant of the circumstances pertaining to the conflict of interest, are flaws affecting the framework within which the trial proceeded that are equivalent to structural error. *See State v. Cruz*, 2005 UT 45, ¶ 17, 122 P.3d 543 ("Structural errors are flaws in the framework within which the trial proceeds, rather than simply an error in the trial process itself." (citation and internal quotation marks omitted)). As a result, I would conclude that the trial court erred when it failed to conduct a proper inquiry into the conflict of interest issues.

¶35    "During an attorney-client relationship, an attorney owes a client a fiduciary duty of loyalty, which requires the attorney to exercise impeccable honesty, fair dealing, and fidelity in dealings with the client." *Roderick v. Ricks*, 2002 UT 84, ¶ 32, 54 P.3d 1119 (citation and internal quotation marks omitted). "At a minimum, an attorney's duty of loyalty to his or her client requires the attorney to refrain from acting as an advocate against the client, even in a case unrelated to the cause for which the attorney is

retained." *State v. Holland*, 876 P.2d 357, 359–60 (Utah 1994). "The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted *solely to the interests of his client*." *Id.* at 359 (additional emphasis omitted) (citation and internal quotation marks omitted). Likewise, the rules forbidding an attorney with an undisclosed conflict of interest from representing a client, suggest that the duty of loyalty essentially requires attorneys who may have divided loyalty, and thereby adversely affect the client, to refrain from undertaking such representation. *Cf.* Restatement (Third) of The Law Governing Lawyers § 121 (2000) ("Unless all affected clients . . . consent . . . , a lawyer may not represent a client if the representation would involve a conflict of interest. A conflict of interest is involved if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the *lawyer's own interests . . . .*" (emphasis added)); *see also id*. § 121 cmt. b. ("The prohibition against lawyer conflicts of interest reflects several competing concerns. First, the law seeks to assure clients that their lawyers will represent them with undivided loyalty."). Indeed, "[t]he duty of loyalty is so essential to the proper functioning of the judicial system that its faithful discharge is mandated not only by the Rules of Professional Conduct, but also, in criminal cases by the Sixth Amendment right of a criminal defendant to the effective assistance of counsel." *Holland*, 876 P.2d at 359. "The faithful discharge of that duty is a vital factor both in uncovering and making clear to a court the truth on which a just decision depends and in protecting the rights of persons charged with a crime." *Id.*

¶36    The facts of this case are, in my experience, both unique and troubling. On the first day of trial, one defense counsel conducted what the trial judge considered to be an improper impeachment effort.[5] Later that evening, without Defendant's knowledge, both

---

[5]The prosecutor objected to defense counsel's questioning and the trial court chose to admonish defense counsel in front of
(continued...)

of his defense counsel engaged in ex parte communications with the district court's presiding judge regarding their feelings of intimidation by Defendant and their concerns about their own ability to adequately represent Defendant. The presiding judge then communicated defense counsel's conflict of interest concerns to the trial judge. The next morning before trial, the trial judge conducted an in-chambers discussion, without including Defendant, regarding the events of the previous evening and defense counsel's feelings of intimidation. The trial court then provided defense counsel with an opportunity to discuss the issue with one another and with the prosecution. The prosecutor spoke with defense counsel about the safety measures that the State could take to alleviate any concerns they may have and offered different safety scenarios.[6]

¶37 Thereafter, the court informed Defendant that his defense counsel had disclosed to the trial court that they were intimidated by him and that nonetheless the court was proceeding with trial. Specifically, the trial court told Defendant,

> I've been informed by your counsel that they feel intimidated by you, whether rightfully or wrongfully they feel intimidated in a way and have disclosed that intimidation and that has perhaps caused them to do things that they would not

---

[5](...continued)
the jury stating that she had conducted an incorrect impeachment. The court then excused the jury and further addressed defense counsel on the improper impeachment, stating "[Y]ou know better than that, right?" She responded, "Right."

[6]Defense counsel apparently accepted the prosecutor's assistance, stating to the court that although they were worried about their own safety, "[t]he State is going to help [us] out. We'll be fine."

otherwise do as officers of the Court. I'm thinking of yesterday's impeachment, for example . . . . I don't know if that's a fair example or not. But that is an appropriate disclosure to place on the record.

We're going forward with this trial. Okay?

After a brief discussion on the impeachment effort, Defendant stated that he was going to file a request for substitute counsel. In support of his request, Defendant initially expressed his concerns about defense counsel in terms of his dissatisfaction with their trial strategy. The trial court reminded Defendant that the court had previously denied Defendant's motion for new trial on that basis. After further discussion about the impeachment effort, Defendant reiterated his request for new trial counsel, and the following relevant exchange occurred:

> THE DEFENDANT: I have a right, you know, to a fair trial. And I don't believe I'm being represented to the fullest like they say—like to be represented. So, I have, you know, problem in (inaudible.)

> THE COURT: You filed a new motion. Filed a motion for new counsel which was denied. Are you looking for new counsel now?

> THE DEFENDANT: Yeah.

> THE COURT: And what would the basis be?

> THE DEFENDANT: Ineffective counsel.

> THE COURT: Well, based upon what?

> THE DEFENDANT: *My lawyers, they feel intimidated by me, so, therefore, we have a conflict of*

> *interest. So therefore, they feel they are afraid of me or*
> *whatever their complaints would be. So, therefore, there's*
> *a conflict between me and the lawyers. So, therefore, I*
> *don't see how we can, you know, communicate without me*
> *feeling that there's a fear between me and them.*

(Emphasis added.)

¶38    The events of this case present several troubling conflict of interest issues pertaining to whether defense counsel's actions violated their duty of loyalty to their client and whether the trial court properly performed its duty of inquiry. The first task is to consider whether defense counsel breached their duty of loyalty and then consider whether the trial court properly inquired into the potential conflict of interest issues.

## I. Defense Counsel's Duty of Loyalty

¶39    First, it is apparent from the record that the loyalties of Defendant's attorneys were indeed compromised as demonstrated by defense counsel's actions related to their claims of intimidation by Defendant.[7] Here, defense counsel were burdened by a conflict

---

[7]The majority concludes that "defense counsel continued to zealously represent Defendant, *despite* Defendant's complaints and apparent efforts at intimidation." *Supra* ¶ 26. However, there is nothing in the record that establishes that Defendant actively intimidated defense counsel. There is no evidence that Defendant, directly or indirectly, threatened counsel either verbally or with physical gestures. Indeed, defense counsel never articulated any action taken by Defendant that caused counsel to feel "a sense of intimidation." The trial court stated that defense counsel "couldn't really articulate what it was, but that there was a sense of being compromised in the ability to exercise a judgment they normally exercise." The only reference

(continued...)

between Defendant's interests and their apparent concerns about their own safety. Instead of addressing their conflict of interest concerns with Defendant, defense counsel took actions without Defendant's knowledge and contrary to Defendant's interests by engaging in various ex parte communications with the presiding judge, the trial judge, and the prosecutor. In so doing, defense counsel appear to have violated their duty to keep their client's confidence and properly inform their client about their actions. *See* Utah R. Prof'l Conduct 1.4(a)(5) ("A lawyer shall: . . . consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law."); *see also* Restatement (Third) of The Law Governing Lawyers § 20 (2000) (providing that when an issue of conflict arises, the lawyer must consult with the client and proceed in the best interest of the client).

¶40     Because defense counsel failed to consult with Defendant, or even inform him of their actions on the conflict of interest issue, Defendant was uninformed and unprepared to present his request for substitute counsel. Based on defense counsel's actions, I conclude that counsel's personal interests diverted their efforts away from Defendant's interest and may well have impaired their abilities to represent Defendant, thereby violating their duty of loyalty to Defendant.

---

[7](...continued)
to Defendant's behavior was during an in-chambers discussion, wherein the presiding judge mentioned that defense counsel "indicated that there was a sense of intimidation and staring down episode and we did not discuss what was behind that, just had to do with counsel be given a response there was the stare down." The circumstances surrounding Defendant's staring are unknown. Defendant may have been simply spacing out, thinking, or keeping a steady gaze as a means of controlling himself. In any case, without more information, the stare down incident does not amount to an act of intimidation.

## II. The Trial Court's Duty of Inquiry

¶41    Second, once the trial court was informed about the potential conflict of interest between defense counsel and Defendant, the court had a duty to inquire into the matter with both counsel and Defendant. The duty of inquiry required the trial court to

> make some reasonable, non-suggestive efforts to determine the nature of the defendant's complaints and to apprise itself of the facts necessary to determine whether the defendant's relationship with his or her appointed attorney has deteriorated to the point that sound discretion requires substitution or even to such an extent that his or her Sixth Amendment right would be violated but for substitution.

*State v. Vessey*, 967 P.2d 960, 962 (Utah Ct. App. 1998) (citation and internal quotation marks omitted). Here, the trial court did not conduct a proper inquiry with defense counsel regarding their conflict of interest claim during the initial in-chambers discussion of the matter, nor did the court inquire with Defendant about his relationship with his counsel after disclosure of the potential conflict. Without such an inquiry the trial court was unable to assess the situation and determine whether an actual conflict of interest existed.

A. Trial Court's Duty To Inquire Into Defense Counsel's Conflict of Interest Claim

¶42    In this case, the trial court merely conducted perfunctory questioning about the potential conflict of interest with defense counsel. During the in-chambers discussion, defense counsel expressed concerns about their ability to adequately and zealously represent Defendant given their claims of intimidation. In

addressing defense counsel's concern, the trial court did not inquire about the acts causing counsel's claims of intimidation. Instead, the court reminded defense counsel of their duty to "adequately and zealously . . . represent [Defendant]," and asked directed questions which were not sufficient to uncover or remedy the potential conflict of interest. In particular, the trial court engaged in the following colloquy:

> THE COURT: It's your duty [to] adequately and zealously . . . represent [Defendant]. And it sounds to me, you correct me if I am wrong, it's not that you are foregoing legitimate cross-examination, you are not foregoing the—and I don't want you to answer this in any way that would invade the integrity of the attorney/client privilege or work product, that it's not that you are foregoing good stuff, it's that perhaps his intimidation has led you to do things that would otherwise be against your professional judgment.
>
> [DEFENSE COUNSEL]: That's accurate, your Honor.

A similar colloquy occurred again after Defendant requested substitute counsel, whereby the trial court asked one defense counsel, "[D]o you believe that you can vigorously represent this Defendant?" and, "[I]s any of this going to affect your ability to act as a zealous advocate?" Defense counsel responded, "Yes, your Honor, I can," and, "No, your Honor, I'm still ready to go forward."[8]

¶43   Neither discussion fulfilled the trial court's duty to inquire into the circumstances of the potential conflict of interest with counsel and ensure that defense counsel could pursue their client's

---

[8]The trial court asked a similar question of defense co-counsel and received a response that she too was able to act as a zealous advocate for Defendant.

best interest. The trial court's inquiry into defense counsel's ability to represent their client was deficient and in many ways similar to cases of failed attempts to properly rehabilitate a juror after issues of bias have been raised. *See State v. Wach*, 2001 UT 35, ¶ 33, 24 P.3d 948 ("It is not enough if a juror believes that he or she can be impartial and fair. Indeed, this court has previously noted that [a] statement made by a juror that she intends to be fair and impartial loses much of its meaning in light of other testimony and facts which suggest a bias." (citation and internal quotation marks omitted)). Personal interests of defense counsel "that are inconsistent with those of a client might significantly limit the lawyer's ability to pursue the client's interest." Restatement (Third) of The Law Governing Lawyers § 125, cmt. b. (2000). In this case, the trial court properly explored neither defense counsel's personal interests, nor the factual basis for the apparent conflict or their ability to represent Defendant.

## B. Trial Court's Duty To Disclose the Potential Conflict Claim and Inquire Into the Matter with Defendant

¶44    Similarly, the trial court conducted perfunctory questioning about the potential conflict of interest with Defendant. When the trial court learned of defense counsel's actions, and certainly once Defendant conveyed renewed dissatisfaction with his counsel and a request to change attorneys, the trial court was required to conduct a meaningful inquiry into the potential conflict with Defendant. Instead of making non-suggestive efforts to determine the nature of the conflict and the relationship between defense counsel and Defendant, the trial court asked very direct questions and did not explore the issue with Defendant related to a potential break down in communication based on defense counsel's feelings of intimidation. Then, after declaring that no conflict existed the trial court denied Defendant's renewed request for substitute counsel. For instance, after Defendant renewed his substitute counsel request, the court merely inquired of defense counsel whether they believed that they could vigorously represent Defendant. *See supra* ¶ 42. Such questions were both rehabilitative

and directive, and did not explore the potential conflict. The trial court's limited inquiry was not sufficient to fulfill the trial court's duty to "make some reasonable, *non-suggestive* efforts to determine the nature of the defendant's complaints." *State v. Vessey*, 967 P.2d 960, 962 (Utah Ct. App. 1998) (emphasis added) (citation and internal quotation marks omitted); *see also id.* ("Even when the trial judge suspects that the defendant's requests are disingenuous and designed solely to manipulate the judicial process and to delay the trial, perfunctory questioning is not sufficient." (citation and internal quotation marks omitted)).

¶45    Compounding the deficiency in the trial court's conflict of interest inquiry is the fact that neither defense counsel nor the trial court informed Defendant of the factual circumstances pertinent to the conflict of interest issue. Defendant was not informed about the other actions defense counsel took based on their feelings of intimidation, i.e., their ex parte communication with the presiding judge and defense counsel's disclosures and subsequent arrangement with the prosecution for additional security measures. Nor was Defendant informed about defense counsel's own concerns about their ability to adequately represent Defendant. Defense counsel had informed the court that "the bigger concern is just our ability to continue to adequately and zealously represent [Defendant] in trial." Without such knowledge about the conflict of interest claim, Defendant would not have been able to, even had the trial court conducted a proper inquiry into the potential conflict of interest issue, have a meaningfully discussion with the court on the matter. Thus, the trial court's duty of inquiry failed both by insufficiently informing Defendant of the pertinent facts and declining to conduct a thorough inquiry into the conflict of interest issue with Defendant.

¶46    In sum, although Defendant was given an opportunity to identify conflict of counsel issues, because he was not present for most of the relevant discussions he was not adequately informed of the facts, and particularly the breadth of the potential conflict, sufficient to provide a meaningful explanation of the conflict.

Moreover, the trial judge, who was aware of the factual circumstances related to the conflict of interest, neither adequately apprised Defendant of the circumstances related to the conflict issue nor conducted a proper follow-up inquiry into the conflict. Thereafter, the trial court did not fulfill its duty to "apprise itself of the facts necessary to determine whether the defendant's relationship with his or her appointed attorney has deteriorated to the point that sound discretion requires substitution." *See Vessey*, 967 P.2d at 962 (citation and internal quotation marks omitted). As a result, I would conclude that the trial court erred in not conducting a more meaningful inquiry into the conflict of interest issue and would reverse and remand as a substantial and structural error, without a requirement to demonstrate prejudice. *See generally State v. Cruz*, 2005 UT 45, ¶ 17, 122 P.3d 543 ("[A] structural error analysis presumes prejudice.").

———————