**2024 UT App 171**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRYCE MASON,
Appellant.

Opinion
No. 20220351-CA
Filed November 21, 2024

Sixth District Court, Junction Department
The Honorable Marvin D. Bagley
No. 201600001

Emily Adams, Freyja Johnson, and Melissa Jo
Townsend, Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1 During a confrontation at an outdoor party, Bryce Mason retrieved a gun from his vehicle. As a result of circumstances that were later disputed at trial, the gun was fired, hitting a nearby partygoer in the foot. A jury later convicted Mason of aggravated assault with serious bodily injury. Mason now challenges his conviction on several grounds, and he also requests a remand under rule 23B of the Utah Rules of Appellate Procedure. For the reasons set forth below, we affirm his conviction and deny his request for a remand.

## BACKGROUND

### *The Incident*

¶2     On the evening of April 26, 2020, Mason and his friend David[1] went to an outdoor party in a canyon in Piute County. Mason had a gun in his vehicle, and he retrieved that gun when conflict arose between David and Braxton, another partygoer. At some point the confrontation escalated to physical blows, and a group gathered around David and Braxton. During the ensuing fight, Mason's gun discharged, hitting a partygoer named Kolten in the foot. The incident ended when Gunnar, who was also at the party, tackled Mason to the ground and threw the gun out of his reach. From this, the State later charged Mason with aggravated assault with serious bodily injury, a second-degree felony, as well as two lesser-included offenses (aggravated assault as a third-degree felony, and threatening with a dangerous weapon in a fight, which is a class A misdemeanor).

### *The State's Case at Trial*

¶3     Several people at the party witnessed the fight and heard the gunshot, and six of them testified for the State at Mason's trial. We note upfront that many (if not all) of the partygoers were drinking, it was dark outside when the relevant events occurred, and the incident happened quickly, so the witnesses' accounts at trial of what happened were somewhat varied.

¶4     The State's first witness was the party's organizer, Natalie. Natalie testified that she posted about the party on social media and that it then "got really big." She said that she did not specifically invite Mason or David.

---

1. We'll refer to attendees of the party who later participated in the trial by their first names only.

¶5    According to Natalie, nobody was fighting before Mason and David showed up. She said that after the two arrived, David "tried to pick a fight with Braxton" but that Braxton declined. She told David and Braxton to "keep it verbal." After the party went on for a while, Natalie heard someone yell, "he's got a gun," at which point she looked over and saw fighting. She said that she did not see the gunshot, but she did hear it. She also testified that she believed that the gun discharged before Mason was on the ground, but she wasn't sure. As she helped Kolten with his gunshot wound, she heard more yelling. When she looked over, she saw Gunnar on top of Mason, and she also saw Gunnar take the gun out of Mason's hand and throw it. During Natalie's testimony, the prosecutor asked her if she'd "ever seen anybody bring a gun" to a party before, to which Natalie responded, "Never."

¶6    The State's second witness was Brayden. Brayden testified that everyone was "drinking beer, sitting by the campfire, talking, hanging out, [when] David started getting mouthy with Braxton." Brayden said that when David and Braxton "started to fight," others shouted out ground rules, such as "[n]o jumping in" and "[n]o going to the ground." Brayden said that David took Braxton to the ground twice, but the group picked them back up "so they could fight standing up."

¶7    Brayden testified that, at one point during the fight, he heard Mason say, "they're rushing us," and he said that he then saw Mason "pull a gun." Brayden said that Mason's gun was "aimed right at us," and he agreed with the prosecutor's suggestion that Mason was holding the gun in a "shooter's position." Brayden said that at that point, he yelled "gun" and watched Gunnar tackle Mason. As Brayden remembered it, the gun went off as Mason "was going down." Brayden said that Gunnar then grabbed "the gun and chuck[ed] it out in the woods." When the prosecutor asked Brayden if he's "ever seen anybody take a gun to one of those parties," Brayden responded, "Never."

¶8     The State's third witness was Garrett. Garrett testified that David and Braxton "wanted to box," but "they just kept going to the ground and wrestling," so the group would make "them stand up." After that happened "two or three times," Garrett heard the gun go off. Garrett said that he saw Gunnar on top of Mason and that Gunnar was angrily hitting Mason. Garrett said that he pulled Gunnar off Mason, that he did not see anyone besides Gunnar punch Mason, and that he did not see the gun. The prosecutor asked Garrett if he'd "ever seen anybody bring a gun" to a party before, to which Garrett said, "No."

¶9     The State's fourth witness was Braxton. Braxton testified that David approached him and insulted him in a vulgar manner in an apparent attempt to start a fight. Braxton said that the two began fighting in what he described as "a boxing match." Braxton said that at some point during the fight, he heard someone say "gun, gun, gun," and when he looked up, he saw "a gun pointed at [him]" from six or seven feet away. Braxton said that he watched Gunnar "football tackle" Mason and that he heard—but did not see—the gun go off. The prosecutor asked Braxton if he had "ever been to a party . . . when anybody brought a gun," to which Braxton responded, "No, absolutely not."

¶10     During Braxton's testimony, the State asked him about a video that purportedly showed portions of the fight between him and David. Braxton testified that he had received the video from another partygoer (though he couldn't remember which one). Mason's counsel (Trial Counsel) stipulated to admission of this video, and it was played for the jury. The video was 14 seconds long, the first 9 seconds of which had no audio. The video showed Braxton hitting David in the face, after which David restrained Braxton with a "wrestling tactic." The video ended before the gunshot.

¶11     The State's fifth witness was Gunnar. Gunnar testified that David and Braxton "were boxing a little bit" and that the group picked them up when "they went down to the ground a couple

times." He said he was "sitting on the flatbed of [his] truck" when he heard someone shout "gun." When he looked up, he saw a "gun pointed at Braxton's head" and reacted by tackling Mason. Gunnar testified that he was then "holding [Mason's] wrist down . . . when [he] heard a gunshot." He said he took the gun from Mason, threw it to the woods, and knocked Mason out. Gunnar said he understood this was a "bad situation" because he'd "seen people get shot" when he previously worked in Denver. The prosecutor asked Gunnar if he had "ever seen . . . anybody bring a gun to [a] party" "when these kids in Utah meet up," to which Gunnar said, "Nope."

¶12    The sixth person to testify was Kolten. Kolten testified that he saw Braxton and David get into a fight. He said that he "stood in the background to make sure things didn't get out of hand" and that when they'd "go to the ground," Kolten and Gunnar would "stand them back up." Kolten did not see the gun, but he heard it go off and realized that he had been shot in the left foot. "At the time, [he] didn't know who had shot [him]." Unlike the approach taken with many of the other State's witnesses, the prosecutor did not ask Kolten if he had previously seen people bring guns to parties.

¶13    At the close of the State's evidence, Trial Counsel moved for a directed verdict, arguing that the State had not put on sufficient evidence to establish the requisite intent. The district court denied the motion, relying on the testimony that Mason had pointed his gun at Braxton or at least at the group generally.

*Mason's Case at Trial*

¶14    In the defense's case, Trial Counsel called two witnesses— a deputy and Mason. Through the deputy's testimony, Trial Counsel offered photographs of Mason and David that were taken on the night of the incident by investigating officers. Those photographs showed injuries on Mason and David that were

consistent with being punched in the face or being involved in a fight.

¶15    Mason testified that after he and David arrived at the party, Braxton approached Mason and said that he wanted to fight. Mason said that he told Braxton that he "didn't want to fight," at which point Braxton walked away. Mason said that this interaction made him "afraid," so he went to his vehicle and retrieved his gun. Mason said that he asked David to leave with him but that David didn't want to.

¶16    According to Mason, Braxton soon approached David and started a fight with him. Mason said that as the two fought, the "other guys . . . would pull David off and . . . set them back up." Mason said that he was yelling, "no fighting, quit fighting." Mason said that while this was happening, someone walked up behind Mason and yelled at him, and when he turned around, he was "slugged in the jaw." Mason said that he pulled his gun out at that point but that he was then tackled to the ground. Mason denied aiming the gun, holding the gun in a "shooter's position," or threatening anyone with the gun. He explained that when he pulled the gun out, he only intended "to hit the guy that hit [him] with it," not to shoot it. He also explained that he had owned the gun since he was 12 years old and that it did not require a lot of pressure to be cocked or discharged. And he further said that at the time the gun "discharged," "a couple guys" were holding his "arm to the ground and holding [onto] the gun trying to pull it from [his] hands," thus suggesting that it had accidentally discharged. Trial Counsel asked Mason if he had "ever seen someone with a firearm at a party," and he said, "Yes, sir. . . . In Iron County . . . [q]uite a few times, about two, three times." After Mason's testimony, the defense rested its case.

*Closing Arguments*

¶17    In the State's closing argument, the prosecutor recounted much of the evidence summarized above, and from this, he

argued that the State had proved that Mason committed the charged offense. In the course of this argument, the prosecutor talked about the culture of fighting that existed when he grew up in Piute County, emphasizing that "nobody ever brought a gun to the [fist]fight." The prosecutor also said that he didn't know how it was in Iron County but that he was "pretty sure it's the same, you don't bring a gun to a party of friends who are around a bonfire." The prosecutor ended his argument by observing that a "kid got shot. It shouldn't happen in our county."

¶18    In the defense's closing argument, Trial Counsel argued to the jurors that it wasn't their role "to remedy what happened" to Kolten and that they should not find Mason "guilty of a crime [he] didn't commit . . . in an attempt to be fair to an alleged victim." He also argued that this case wasn't "about gun laws" or about the jurors' "opinion[s] about guns" or about drinking around guns. Instead, the jury's role was to "figure out what the facts are" and "to apply those facts to the law." Trial Counsel then conceded that several elements of aggravated assault with serious bodily injury had been satisfied—namely, that on April 26, 2020, in Piute County, Mason had been involved in an incident with a gun and that this resulted in serious bodily injury to Kolten. But Trial Counsel urged the jurors to focus on the intent element, arguing that Mason did not "knowingly or intentionally" commit an assault on Kolten because he did not aim the gun at Kolten and his "hand [was] being held to the ground." Trial Counsel suggested that jurors may "want to consider the brandishing [charge]," because that offense does not require intent to harm. And he also argued that the State failed to prove that Mason wasn't acting in defense of himself or David.

¶19    After the case was submitted, the jury found Mason guilty of aggravated assault with serious bodily injury.

*Post-Trial Motions*

¶20    A few weeks after Mason was convicted (but before sentencing), Trial Counsel filed a motion to arrest judgment and to reduce the degree of conviction. Trial Counsel argued that (1) even if Mason pulled the gun out and pointed it at Kolten, this was not enough to constitute assault and (2) the evidence only showed that the gun had gone off as a result of Mason being tackled to the ground but there was no evidence that Mason had voluntarily pulled the trigger. For these and other reasons, Trial Counsel asked the district court to vacate the second-degree felony aggravated assault conviction and instead conclude that Mason's conduct "constituted, at most, third degree aggravated assault." Trial Counsel then asked the court, if that relief were granted, to reduce the third-degree aggravated assault conviction to a class A misdemeanor pursuant to Utah Code section 76-3-402(2).

¶21    A short time later, Trial Counsel filed a motion to withdraw as counsel. Trial Counsel explained that Mason believed that his representation had been "ineffective and deficient" and that these issues "may need to be raised . . . in a Motion for a New Trial." Trial Counsel also noted that he and Mason "had fundamental disagreements regarding the importance of some of the evidence or lack thereof in the case."

¶22    Before the district court ruled on Trial Counsel's motion to withdraw, Mason filed a pro se motion requesting a new trial. Mason pointed out that an attorney who had briefly represented him in the initial stages of the case (and who, to be clear, was not Trial Counsel) had hired a private investigator. According to Mason, the private investigator had discovered "a great deal of exculpatory information favorable to [Mason's] defense," but this evidence was not introduced at trial due to what Mason alleged was Trial Counsel's "ineffectiveness." In his motion and in his own supporting affidavit, Mason faulted Trial Counsel for:

- not requesting forensic testing on Mason's gun, despite repeated requests to do so;

- not retaining an expert to enhance a second video that had been taken by a partygoer of some of the events, which Mason now contended could have, with enhancements, supported his version of the events; and

- not calling an additional partygoer, John, who was interviewed by the investigator and could allegedly offer testimony that, in Mason's view, would support his version of the events.

¶23 After Trial Counsel withdrew, Mason asked the district court to appoint an attorney to assist him with his post-trial motions and sentencing. At a subsequent hearing, the court appointed an attorney (Successor Counsel) to represent Mason moving forward, and the court then set an argument hearing for a few weeks out to give Successor Counsel time to prepare.

¶24 At that hearing, Successor Counsel addressed both Trial Counsel's motion to arrest judgment and Mason's pro se motion for a new trial. On the motion to arrest judgment, Successor Counsel argued consistent with the approach taken in the motion, pointing to various perceived deficiencies in the evidence and asking the court to conclude that the State had not presented sufficient evidence to establish the intent element of the offense. In contrast to the motion, however, Successor Counsel expressed "reservations about reducing the degree of conviction," pointing out that the jury had been instructed on lesser included offenses.

¶25 Successor Counsel then turned to Mason's pro se motion for a new trial. Successor Counsel told the court that, in his view, the motion should actually be "stricken." Successor Counsel gave several reasons for this, including that the motion was "not supported by a memorandum of points and authorities," as well as that Mason was represented by counsel "at the time [the]

motion was filed." Successor Counsel further asserted that while Mason was now faulting Trial Counsel for not introducing evidence, "[t]here often is a strategic reason for not bringing certain evidence forward." And Successor Counsel observed that, in his view, the district court could not grant a new trial because double jeopardy had attached.[2]

¶26    In a written decision, the district court subsequently denied Mason's motion to arrest judgment. In doing so, the court addressed and rejected the various arguments that Mason had made through his attorneys in support of that motion. With respect to the motion for a new trial, the court concluded that Mason did not have authority to file it given that he was represented by counsel at the time. As a result, the court said that it would "not consider" the motion and would instead deny it on that limited basis.

¶27    Mason appealed his conviction and then obtained appellate counsel. Contemporaneous with his appellate brief, he filed a motion for a rule 23B remand, asking this court to remand for factual development of several ineffective assistance of counsel claims.

---

2. Successor Counsel's assertion about the potential double jeopardy problem was incorrect. *See State v. Rudolph*, 970 P.2d 1221, 1232 (Utah 1998) (stating that a defendant generally waives any double jeopardy defense if he or she seeks a mistrial). And while we have no need to delve into the particulars, Mason now points to several other legal assertions that Successor Counsel made that were arguably incorrect as well. As explained below in Part III, however, we conclude that Mason has not established that he received ineffective assistance from Successor Counsel's conduct.

ISSUES AND STANDARDS OF REVIEW

¶28    On appeal, Mason argues that he received ineffective assistance because (1) Trial Counsel did not object when the prosecutor asked several witnesses about whether they'd seen guns at other parties, (2) Trial Counsel did not object to certain statements the prosecutor made during closing arguments, and (3) Successor Counsel did not renew (and even advocated against) Mason's pro se motion for a new trial. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Amboh*, 2023 UT App 150, ¶ 16, 541 P.3d 299 (quotation simplified).[3]

¶29    Alongside his brief, Mason has also filed a request for a remand pursuant to rule 23B of the Utah Rules of Appellate Procedure. A rule 23B remand is "available only upon a nonspeculative allegation of facts, not fully appearing in the

---

3. As noted above, Mason filed a pro se motion for a new trial in which he assailed Trial Counsel's alleged "ineffectiveness" for not introducing certain evidence. Although the district court considered and denied that motion, this ruling was based on the court's conclusion that Mason was not authorized to file the motion (as opposed to the court rejecting the ineffective assistance argument on substantive grounds).

     The third claim we've identified above is related to that motion. But it's nevertheless distinct from the claim that the district court rejected—namely, Mason is now claiming that he received ineffective assistance from *Successor Counsel* when Successor Counsel effectively advocated against his earlier motion. Because that claim has not previously been raised or ruled on, it is appropriately regarded as being raised for the "first time on appeal" for purposes of this appeal and the standard of review.

record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. Prosecutor's Questions About Guns

¶30 Mason argues that Trial Counsel provided ineffective assistance by not objecting when the prosecutor asked several witnesses about whether they'd previously seen guns at parties.

¶31 To prevail under a traditional *Strickland* ineffective assistance claim, Mason must show that counsel performed deficiently and that the deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *see also State v. Suhail*, 2023 UT App 15, ¶ 122, 525 P.3d 550, *cert. denied*, 531 P.3d 730 (Utah 2023). To establish deficient performance, Mason must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Forbush*, 2024 UT App 11, ¶ 25, 544 P.3d 1 (quotation simplified), *cert. denied*, 550 P.3d 995 (Utah 2024). The focus of this inquiry is reasonableness, and when "we judge the reasonableness of counsel's challenged conduct," we do so "viewed as of the time of counsel's conduct." *State v. Carter*, 2023 UT 18, ¶ 45, 535 P.3d 819 (quotation simplified).

¶32 To establish prejudice, Mason "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Suhail*, 2023 UT App 15, ¶ 122 (quotation simplified). In determining whether Mason was prejudiced, we "consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see also State v. King*, 2012 UT App 203, ¶ 46, 283 P.3d 980 ("When we examine counsel's alleged errors, we consider the totality of the evidence to determine whether the errors altered the entire evidentiary picture and whether the verdict is

supported by the record." (quotation simplified)). Moreover, we also "assess counterfactual[] scenarios" of "what would have happened but for the ineffective assistance." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203. This "counterfactual analysis requires us to consider a hypothetical—an alternative universe in which the trial went off without the error." *State v. Garcia-Flores*, 2021 UT App 97, ¶ 27, 497 P.3d 847 (quotation simplified). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address . . . either prong" in our review. *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182; *see also State v. Meik*, 2024 UT App 46, ¶ 31, 547 P.3d 878 (recognizing that because a defendant "must establish both prongs," if "either is lacking, the claim fails and this court need not address the other" (quotation simplified)), *cert. denied*, 554 P.3d 923 (Utah 2024).[4]

---

4. As discussed, *Strickland v. Washington* sets forth the familiar two-part test for an ineffective assistance claim, wherein a defendant must prove both deficient performance and prejudice. 466 U.S. 668, 687–88, 694 (1984). *Strickland* also briefly discussed a defendant's right to have conflict-free counsel, referring to such a claim as a "type of actual ineffectiveness claim." *Id.* at 692; *see also Taylor v. State*, 2007 UT 12, ¶ 123, 156 P.3d 739 ("The right to effective assistance of counsel includes the right to counsel free from conflicts of interest." (quotation simplified)). But the ineffective assistance claims at issue in *Strickland* did not include a claim that defense counsel there had a conflict of interest. *See* 466 U.S. at 675–78, 698–701.

In Part III(A) below, we address Mason's claim that his counsel violated the duty of loyalty—which, we explain, is linked to a defendant's right to have conflict-free counsel. For clarity, we note here that references throughout this opinion to a "traditional" *Strickland* claim refer to a claim that is based on an assertion of deficient performance plus prejudice.

¶33  As noted, the prosecutor asked five witnesses if they had previously seen someone bring a gun to a party. Mason now argues that Trial Counsel should have objected to this questioning, asserting that it "called the jury's attention to matters it was not justified in considering," "elicited irrelevant evidence," and "elicited unfairly prejudicial evidence." In response, the State argues that the questioning "was relevant to Mason's claimed justification defense." We need not decide the deficient performance question, however, because we conclude that Mason has not established prejudice.

¶34  According to Mason, this line of questioning prejudiced him because "the State's evidence was conflicted" and "it was heavily contested whether [Mason] caused [Kolten's] injuries and whether he acted in self-defense." But the alleged conflicts in the evidence that Mason points to were already presented to the jury, yet the jury convicted Mason anyway. And the jury had a clear basis for doing so. As explained, it was uncontested that Mason voluntarily retrieved a gun from his car, and no one has ever claimed that anyone else displayed a gun that night. Two witnesses (Braxton and Gunnar) testified that they saw Mason pointing the gun at Braxton before it went it off, and a third witness (Brayden) testified that he saw Mason pointing it at the group more generally from a "shooter's position." This testimony was the driving force behind the State's case: the district court used it to deny Mason's motion for a directed verdict, and the prosecutor relied on it in his closing argument to establish intent. And it has never been disputed that it was a bullet fired from Mason's gun that injured Kolten.

¶35  It's true that Mason testified on his own behalf and claimed that he never pointed the gun at anyone. But although there were "20 to 30" people at the party, Mason presented testimony from no other witness to support his claim that he never pointed the gun. This meant that the evidentiary picture on this point was skewed in the State's favor (three witnesses testified that they did see Mason point the gun at someone, with only Mason saying that

he didn't). The jury heard this testimony and convicted Mason, thus indicating that it found the testimony from the State's witnesses to be credible.

¶36 Again, the question before us now is whether there's a reasonable probability that Mason would have obtained a more favorable outcome in an "alternative universe in which the trial went off without the error." *Garcia-Flores*, 2021 UT App 97, ¶ 27 (quotation simplified). And "the error" at issue is the prosecutor's questions about whether various witnesses had previously seen a gun at a party. While the prosecutor clearly intended to make a point with these questions, that point was secondary to the question before the jury, which was what happened at this party. And we also note that, in apparent response to the prosecutor's questions, Trial Counsel asked Mason if he had "ever seen someone with a firearm at a party," to which Mason responded that he had seen this "[q]uite a few times, about two, three times." If the prosecutor's questions (and the resultant answers) had been removed from the equation, Mason's presumably favorable exchange would have been removed too.

¶37 Having reviewed the record and the arguments on this point, we're not persuaded that there's a reasonable probability that, without these questions and answers, the jury would have viewed the evidence so differently that Mason would have received a more favorable verdict. We therefore reject this claim for lack of prejudice.

## II. Prosecutor's Closing Argument

¶38 Mason next argues that Trial Counsel was ineffective for not objecting to a statement the prosecutor made during closing argument—namely, that "[a] kid got shot. It shouldn't happen in our county." In Mason's view, this statement "improperly suggested that the jury base its decision on the impact of the verdict on the small, rural community from which the jury was drawn." We reject this challenge for lack of deficient performance.

¶39 There are many "legitimate, strategic reasons" why an attorney might choose to not object to a statement made during closing argument, even where the statement is "improper" or objectionable. *State v. Isom*, 2015 UT App 160, ¶ 38, 354 P.3d 791.

> First, trial counsel could reasonably have believed that objecting would call attention to the improper statements and suggest to the jury that they were damaging when counsel felt they were not. Second, trial counsel might also have sensed that the jury was weary and inattentive to the prosecutor and that objecting would only serve to focus their attention on the remark. Finally, trial counsel's decision not to object could have been motivated by concern that an objection would create antipathy to the defense if the jury perceived that counsel's repeated objections were only prolonging the proceedings.

*Id.* (quotation simplified). In this sense, "the law recognizes the prerogative of opposing counsel to swallow their tongue instead of making an objection that might have the risk of highlighting problematic evidence or even just annoying the jury." *State v. Granere*, 2024 UT App 1, ¶ 62, 543 P.3d 177 (quotation simplified), *cert. denied*, Sept. 23, 2024 (No. 20240134).

¶40 We've thus recognized that counsel may reasonably conclude "that objecting might suggest to the jury that it is a troublesome point—one worth objecting to—while letting it go demonstrate[s] counsel's confidence in the jury's ability to distinguish between evidence and argument, a subject covered in the jury instructions." *State v. Shepherd*, 2015 UT App 208, ¶ 52, 357 P.3d 598. And we've also recognized that an attorney may reasonably decide "that rather than highlight the overall issue for the jury," counsel will instead choose to address the issue "during [counsel's] own closing argument." *State v. Bermejo*, 2020 UT App 142, ¶ 90, 476 P.3d 148 (quotation simplified). As a result, "when

we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but *whether they were so improper* that counsel's only defensible choice was to interrupt those comments with an objection." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (emphasis in original, quotation otherwise simplified).

¶41 Here, even though Trial Counsel could have conceivably objected to the statement in question, Trial Counsel could also have reasonably thought that jurors might think it odd if he objected to the assertion that "a kid" getting "shot" "shouldn't happen in our county." After all, no one would think that a kid getting shot is something that should happen in the county. This, alone, is likely enough to defeat the deficient performance claim. Moreover, Trial Counsel could also have reasonably thought that he didn't need to object. After all, the statement in question was something of a passing comment that was not elaborated on at length. And Mason's defense didn't depend on jurors somehow approving of Kolten having been shot. To the contrary, Mason's defense was that he never pointed the gun at anyone, that he never intended to shoot anyone, and that the gun was accidentally fired when he was tackled to the ground. In his own closing argument, Trial Counsel thus argued to jurors that it wasn't their role "to remedy what happened to [Kolten]" and that they shouldn't find Mason "guilty of a crime [he] didn't commit . . . in an attempt to be fair to an alleged victim." Trial Counsel therefore chose to respond to the prosecutor's closing argument through a responsive closing argument of his own, as opposed to making an objection. This was a reasonable choice on how to deal with the potentially inflammatory argument. *See Bermejo*, 2020 UT App 142, ¶ 90.

¶42 In short, we agree with the State that the statement in question was not "*so improper* that counsel's only defensible choice was to interrupt those comments with an objection." *Houston*, 2015 UT 40, ¶ 76 (emphasis in original, quotation otherwise

simplified). We therefore reject this argument for lack of deficient performance.

### III. Mason's Pro Se Motion for a New Trial

¶43    As noted, Trial Counsel filed a post-trial motion to arrest judgment. While Mason was still represented by Trial Counsel, Mason separately filed a pro se motion for a new trial. After Trial Counsel was replaced by Successor Counsel, Successor Counsel appeared at a hearing and argued in favor of the motion to arrest judgment but against Mason's new trial motion.

¶44    On appeal, Mason argues that Successor Counsel's actions were improper and grounds for reversal—both as a violation of the duty of loyalty and, separately, as ineffective assistance of counsel under the traditional *Strickland* standard. We disagree.

### A.    Duty of Loyalty

¶45    Mason first argues that Successor Counsel violated his "duty of loyalty" toward Mason. As explained below, we understand the duty of loyalty to be linked to the right to conflict-free counsel. With that understanding, we see no reversible error.

¶46    The starting place for our analysis is *State v. Holland*, 876 P.2d 357 (Utah 1994). There, our supreme court recognized that "an attorney's duty to represent the interests of a client with zeal and loyalty" is "[c]ritical to the attorney-client relationship and the integrity of judicial proceedings." *Id.* at 359. And the court further recognized that the "duty of loyalty is so essential to the proper functioning of the judicial system that its faithful discharge is mandated not only by the Rules of Professional Conduct, but also, in criminal cases, by the Sixth Amendment right of a criminal defendant to the effective assistance of counsel." *Id.*

¶47    After connecting the duty of loyalty to the Sixth Amendment right to the effective assistance of counsel, *Holland*

elaborated on the duty's contours. The court explained that, "[a]t a minimum, an attorney's duty of loyalty to his or her client requires the attorney to refrain from acting as an advocate against the client, even in a case unrelated to the cause for which the attorney is retained." *Id.* at 359–60. It further explained that an "attorney who acts upon a belief that his client should be convicted fails to function in any meaningful sense as the government's adversary." *Id.* at 360 (quotation simplified). Of some note, the court then held that if

> an attorney's *loyalty is compromised because he believes that his client should be convicted or because he is influenced by a conflict in loyalties to other defendants,* third parties, or the government, the law cannot tolerate the risk that the attorney will fail to subject the prosecution's case to the kind of adversarial challenge necessary to ensure that the accused receives the effective assistance of counsel as guaranteed by the Sixth Amendment.

*Id.* (emphasis added). The court thus stressed that the duty of loyalty may be violated if the attorney's conduct was such that the proceeding had "clearly lost its adversary character," such as when the attorney has "effectively join[ed] the State in an effort to attain a conviction or a death sentence." *Id.* (quotation simplified).

¶48 The court then explained how this had occurred in the case before it. The defendant there (Holland) had been sentenced to death after pleading guilty to homicide. *See id.* at 358. While Holland's appeal was pending, his attorney called Holland to testify at the penalty hearing of one of the attorney's other clients—Taylor—and the attorney did so in an attempt to argue to Taylor's jury that while Holland was "a prime candidate for the death penalty," Taylor was not. *Id.* at 358–59 (emphasis omitted). Although the court excluded the proposed testimony in the *Taylor* case, our supreme court concluded in the *Holland* case that it could not "countenance or condone" the continued representation of

Holland "by an attorney who ha[d] stated in a public document that his client is 'a prime candidate for the death penalty.'" *Id.* at 361. The court further held that because of "the direct and fundamental nature of the duty of loyalty," it would "not inquire into the issue of whether the breach of that duty was prejudicial." *Id.* Instead, the court removed Holland's attorney from Holland's case moving forward. *See id.*

¶49 Our supreme court later addressed the duty of loyalty in *Taylor v. State*, 2007 UT 12, 156 P.3d 739, which involved the same Taylor who had been indirectly implicated in *Holland*. 876 P.2d at 358. On appeal from his own conviction and death sentence, Taylor raised a duty-of-loyalty claim of his own. *See Taylor*, 2007 UT 12, ¶¶ 122–26. In addressing that claim, the supreme court referred to its decision in *Holland* and described the duty-of-loyalty claim that was addressed in *Holland* as having been a "conflict of interest" claim. *Id.* ¶ 124. The court thus explained that "[d]espite trial counsel's *conflict-based disqualification* in the *Holland* case," Taylor's claim failed because he had "not pointed . . . to any evidence suggesting that trial counsel ever acted *to advance interests other than Taylor's*." *Id.* ¶ 125 (emphases added). Reiterating this same point, the court rejected Taylor's claim because Taylor had not identified "the ulterior interest he believe[d] trial counsel was serving," nor had he "connect[ed] the alleged deficiencies to anything other than poor lawyering." *Id.* ¶ 126.

¶50 Consistent with *Holland* and *Taylor*, our supreme court has repeatedly linked a Sixth Amendment duty-of-loyalty claim with a Sixth Amendment conflict-of-interest claim. In *Gardner v. Holden*, for example, our supreme court noted that a "presumption of prejudice" applies "when defense counsel labors under an actual conflict of interest, because an attorney's duty of loyalty is the most basic of counsel's duties." 888 P.2d 608, 620 (Utah 1994) (quotation simplified). And in *Menzies v. State*, the supreme court again linked the two duties, noting that "counsel owes the client a duty of loyalty, a duty to avoid conflicts of

interest." 2014 UT 40, ¶ 156, 344 P.3d 581 (quotation simplified), *abrogated on other grounds by McCloud v. State*, 2021 UT 51, 496 P.3d 179. A number of other Utah appellate decisions have drawn this same link. *See, e.g., State v. Sessions*, 2014 UT 44, ¶ 39, 342 P.3d 738; *State v. Tirado*, 2017 UT App 31, ¶ 11, 392 P.3d 926; *State v. Goodrich*, 2016 UT App 72, ¶ 15, 372 P.3d 79; *State v. Martinez*, 2013 UT App 39, ¶ 25, 297 P.3d 653; *State v. Brandley*, 972 P.2d 78, 83–86 (Utah Ct. App. 1998).

¶51     Indeed, while Mason largely discusses his own argument in duty-of-loyalty terms, he also appears to recognize its link to the conflict-of-interest standard, repeatedly asserting, within this same argument, that Successor Counsel's actions constituted a "conflict of interest." And he also identified this as a conflict-of-interest claim in the Issues Presented section of his brief. Viewed systemically, this link makes sense. Mason's duty-of-loyalty claim relies heavily on Successor Counsel's decisions to not renew his pro se motion for a new trial and even advocate against it. But Utah's caselaw is replete with situations in which Utah appellate courts assessed claims of omission or even commission under the traditional *Strickland* standard. If it were true that the duty of loyalty (and, of particular note, its relaxed prejudice standard) is implicated whenever an attorney does or doesn't do something that a reasonably competent attorney should have done, this could well swallow *Strickland* wholesale, which is a result that Utah's duty-of-loyalty cases do not contemplate. This helps explain why the duty-of-loyalty doctrine invoked by Mason is properly understood as being a form of a conflict-of-interest claim.

¶52     So viewed, Mason's claim fails. As noted, Mason's claim is centered on Successor Counsel's decision to argue against Mason's pro se motion for a new trial. In support of his assertion that this violated the duty of loyalty, Mason relies heavily on *Taylor*'s description of the *Holland* attorney having violated the duty of loyalty by taking "a position that was directly contrary to the defendant's interest." *Taylor*, 2007 UT 12, ¶ 124 (quotation

simplified). But again, in that same sentence, the supreme court described the issue before it as being whether the *Holland* attorney had a "conflict of interest." *Id.* And shortly thereafter, the court rejected Taylor's duty-of-loyalty claim because Taylor had not shown that his counsel was motivated by an "ulterior interest" that "counsel was serving," which the court viewed as being distinct from a claim of "poor lawyering." *Id.* ¶ 126.

¶53   Because this is a species of a conflict-of-interest claim, Mason can only prevail if he makes "a threshold showing that a conflict [actually] existed." *Menzies*, 2014 UT 40, ¶ 153; *see also Taylor*, 2007 UT 12, ¶ 123. Put differently, Mason must show that "counsel was forced to make choices advancing other interests to the detriment of his client." *Taylor*, 2007 UT 12, ¶ 124 (quotation simplified).

¶54   Mason has not done this. Like Taylor, Mason has not shown that his attorney was acting "to advance interests other than" his own. *Id.* ¶ 125. This case is thus distinguishable from *Holland*, where the attorney in question was compromised by both (1) competing loyalties to two different clients and (2) the attorney's pronounced and stated belief that his client should perhaps receive the most severe criminal penalty possible: the death penalty. Mason has not made either showing here. He has not shown that Successor Counsel had any divided loyalties to some other client, nor has Mason pointed to anything showing that Successor Counsel had some pronounced personal belief that Mason should be convicted, much less that Successor Counsel's personal beliefs were so pronounced that they caused him to advocate against Mason's interests in this or any other case.

¶55   In short, we understand the question of whether Successor Counsel engaged in "poor lawyering" to be one that is properly assessed under the traditional *Strickland* formulation. To the extent that Mason claims this violated the duty of loyalty, that

claim fails because Mason has not shown that Successor Counsel had a conflict of interest. We thus reject this claim.[5]

---

5. Regardless, even if a duty of loyalty claim could be regarded as being conceptually distinct from a conflict-of-interest claim, we would also reject Mason's claim on its own terms. Again, *Holland* suggested that the attorney there had violated the duty of loyalty by "effectively join[ing] the state in an effort to attain a conviction or a [particular] sentence." *State v. Holland*, 876 P.2d 357, 360 (Utah 1994) (quotation simplified). In this sense, *Holland* contemplated that the duty of loyalty was violated because the proceeding had "clearly lost its adversary character." *Id.*

But our cases establish that an attorney doesn't render ineffective assistance under *Strickland*, much less violate the duty of loyalty, by conceding individual motions or even elements of an offense if those concessions were part of a strategy that still advocated for the defendant's broader interests. *See, e.g.*, *State v. Lingmann*, 2014 UT App 45, ¶¶ 26–29, 340 P.3d 1063 (holding that counsel was not ineffective for "conceding the elements of solicitation and pursuing a voluntary-termination defense"); *State v. Martinez*, 2013 UT App 39, ¶ 28, 297 P.3d 653 (recognizing that an attorney may concede guilt on a lesser-included offense in hopes of obtaining an acquittal on the most serious offense, and this is "a perfectly acceptable strategy which should not be second guessed by the courts" (quotation simplified)).

Here, it's true that Successor Counsel advocated against Mason's pro se motion for a new trial. But in that same hearing, Successor Counsel advocated *for* the motion to arrest judgment, thus directly asking the court to vacate Mason's conviction. While we address the potential implications of Successor Counsel's approach under the traditional *Strickland* framework in the next subpart of this opinion, we conclude here that Successor Counsel was not "effectively join[ing] the state in an effort to attain a conviction" or the maximum sentence. *Holland*, 876 P.2d at 360

(continued…)

B.      Traditional *Strickland* Claim

¶56     Mason next argues in the alternative that Successor Counsel provided ineffective assistance under the traditional *Strickland* standard by not refiling his pro se motion for a new trial and instead arguing against it. As noted, Mason must show both deficient performance and prejudice to prevail on this claim, and if proof of either prong "is lacking, the claim fails and this court need not address the other." *Meik*, 2024 UT App 46, ¶ 31 (quotation simplified). And to establish prejudice, Mason "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Suhail*, 2023 UT App 15, ¶ 122 (quotation simplified). We reject this claim for lack of prejudice.

¶57     Mason's claim is premised on the assertion that he would have obtained a more favorable outcome if Successor Counsel had adopted and then advocated for the assertions he'd previously advanced in his pro se motion for a new trial. In other similar ineffective assistance cases, we've commonly looked to the likelihood of success of the missing motion. *See, e.g.*, *State v. Beames*, 2022 UT App 61, ¶ 17 n.3, 511 P.3d 1226 (considering whether the missing motion "was *likely to be* granted" (emphasis in original, quotation otherwise simplified)); *State v. Makaya*, 2020 UT App 152, ¶¶ 9, 18, 476 P.3d 1025 (rejecting an ineffective assistance claim where it appeared that the "motion would have been denied"). And this makes sense. If the missing motion would

---

(quotation simplified). Because the conduct in question falls far short of the abdication-of-defense scenario contemplated by *Holland*, we see no basis for concluding that the duty of loyalty was violated on even its own substantive terms. For this reason too, the claim fails.

not have been granted, then the defendant likely could not show prejudice.[6]

¶58    A district court "may . . . grant a new trial in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party." Utah R. Crim. P. 24(a). This rule allows a defendant to obtain a new trial upon a showing of ineffective assistance. *See, e.g.*, *State v. Lewis*, 2014 UT App 241, ¶ 8 n.6, 337 P.3d 1053. While Mason's pro se motion below alleged that Trial Counsel was ineffective on several grounds, Mason focuses on just one of them on appeal: Trial Counsel's failure to call John as a defense witness.

¶59    Mason points out that the jury "heard from six witnesses" who supported the State's case in various ways, and he thus argues that "[w]ithout John's testimony, the jury heard a lopsided view of the evidence that favored the State's theory of the case." But Mason then argues that John's testimony would have "corroborated key portions of [Mason's] testimony." And in Mason's affidavit that he submitted below to support his motion for a new trial, he identified how he believes John would have helped him. According to Mason, John would have said that Braxton initiated the fighting (not David); that Mason "started getting into a fight . . . and he ended up pulling a gun"; that Brayden "pushed [the gun] down, and it went off," thus suggesting that Brayden's actions may have contributed to the

---

6. Our supreme court has recently contemplated that there may be "instances where failure to file even a losing motion—to ensure an issue is preserved, for example—might constitute unreasonable performance." *State v. Carter*, 2023 UT 18, ¶ 44, 535 P.3d 819. But Mason has not persuaded us that any such circumstance exists here. Instead, his prejudice argument focuses on his assertion that there was "a reasonable probability that the court would have granted the motion."

gun firing; and that John thought that Mason did not intend to hurt anyone.

¶60    In response, the State points to various weaknesses in this proposed testimony. As a starting place, the State notes that Mason's account was based on what an investigator allegedly told him that John had told the investigator, which the State describes as "double or triple hearsay." In the State's view, "[t]here is simply no record evidence of what John would actually have testified to at trial, under oath and subject to cross-examination." The State further points out that Mason's assertions about John's proposed testimony are not consistent with the written statement John gave to law enforcement on the night of the incident.[7] As a result, if John had testified in the manner that Mason proposes, the State argues that it would have been able to undermine his credibility by pointing to certain conflicts in the evidence.

¶61    But even if we assume that John would have testified consistently with the version of facts set forth in Mason's affidavit, we're still not persuaded that there's a reasonable possibility that the court would or should have granted the motion. Again, the State's case was based on the testimony of six witnesses who all supported pieces of the State's claim to varying degrees, which is why Mason himself describes this on appeal as having been a "lopsided" evidentiary picture. If John's testimony had been added to the mix, the evidentiary picture would still have been lopsided in the State's favor. And while Mason offers various reasons why the accounts from the State's witnesses might not have been credible—primarily that it was dark outside, that many of the partygoers were drinking, and that the events in question

---

7. For example, Mason alleges in his affidavit that John would have testified that Brayden "pushed [the gun] down, and it went off," suggesting that Brayden's actions may have contributed to the gun firing. But in his written statement, John says nothing about Brayden pushing the gun. Rather, John just said that the "gun went off."

happened quickly—many (if not all) of these circumstances were attendant to John's proposed testimony too.

¶62    Thus, even with John's proposed testimony, the central features of this case would have remained unchanged: Mason voluntarily retrieved a gun from his car, no one else was seen with a gun that night, several witnesses testified at trial that they saw Mason point the gun at someone, and the gun went off, striking a bystander in the foot. The proposed additional testimony from John would have been somewhat compromised by darkness and circumstance, it wasn't particularly definitive in Mason's favor even on its own terms (for example, John would apparently have testified that he saw Mason voluntarily retrieve the gun and then pull it out during the confrontation), and the overall weight of the testimony still favored the State. In light of all this, Mason has not persuaded us that there's a reasonable probability that, if Successor Counsel had refiled the motion for a new trial (as opposed to advocating against it), the motion would have been granted. We therefore reject his claim for lack of prejudice.

## IV. Rule 23B Remand

¶63    Alongside his brief, Mason filed a motion for a remand pursuant to rule 23B(a) of the Utah Rules of Appellate Procedure. Under that rule, a

> party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel. The motion will be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective.

To obtain a rule 23B remand, a defendant must "present the court with the evidence he intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *Suhail*, 2023 UT App 15, ¶ 126 (quotation simplified). If the proffered evidence and arguments do not "meet the test for ineffective assistance of counsel," "there is no reason to remand the case." *State v. Samples*, 2022 UT App 125, ¶ 57, 521 P.3d 526 (quotation simplified), *cert. denied*, 525 P.3d 1279 (Utah 2023); *see also State v. Miller*, 2023 UT App 85, ¶ 52, 535 P.3d 390 (explaining that "the alleged facts, if true, must establish both elements of a traditional ineffective-assistance claim" (quotation simplified)), *cert. denied*, 540 P.3d 78 (Utah 2023).

¶64 In his motion, Mason requests a remand to create a record on two potential claims: first, that Trial Counsel was ineffective for not moving to suppress a video of the fight that was admitted at trial; and second, that Trial Counsel should have sought to introduce an enhanced version of a video taken by a partygoer that captured the moment that his gun was fired. We deny both requests because Mason has not established prejudice.

A. Fight Video

¶65 As noted above, Trial Counsel stipulated to admission of a 14-second video during Braxton's testimony, and the first 9 seconds of this video had no audio. The video showed Braxton hitting David in the face, after which David tackled him. The video ended before the gunshot.

¶66 In support of his rule 23B motion, Mason has provided an affidavit in which he proffers that, according to an expert he has consulted, the lack of audio on the first 9 seconds might be the result of the original video having been compressed while being sent through a messaging service. In his motion, Mason argues that Trial Counsel performed deficiently for not seeking to exclude the original video because either (1) it was inadmissible under the best evidence rule or (2) it was unfair to introduce a

potentially altered version of the video. We deny the request for a remand, however, because Mason has failed to persuade us that he was prejudiced by the alleged deficient performance.

¶67    This video did not purport to show the gunshot that was central to the State's case. And while it may have had some potential bearing on what led up to the shooting (such as who was the aggressor in the fight between Braxton and David), we're not persuaded that the video had any meaningful impact on the jury's verdict. As noted, the question before us is whether, in a hypothetical trial that proceeded without this video, Mason would have obtained a more favorable outcome. But even without the video, the evidence would still have been "lopsided" in favor of the State in the same manner described above. Again, as Mason explains the state of the evidence on appeal, the jury "heard from six witnesses who testified that [Mason] tried to start a fight, that [David] fought willingly, that [Mason] did not fight with anyone before the gun went off, and that the gun went off without anyone else touching it." Because of all this, Mason has not persuaded us that removing the video from the evidentiary picture would have resulted in a more favorable verdict. We therefore deny this request for a remand.

B.    Gunshot Video

¶68    In his pro se motion for a new trial, Mason faulted Trial Counsel for not introducing a second video that was taken by a partygoer and later given to law enforcement by Kolten. This video allegedly captured the moment that the gun was fired. In support of his rule 23B motion, Mason provided an affidavit from Trial Counsel, who states that he "did not think about getting the video enhanced" because it "was so dark and so short." Mason also provided an affidavit from his father, who says that a third-party company has now enhanced the video to "sharpen" it and "adjust [its] light levels." Mason provided us with copies of both the original and the enhanced video. From this, Mason requests a remand so that he can create a record to show that Trial Counsel

was ineffective for not (1) retaining an expert to enhance the gunshot video and (2) introducing the enhanced video at trial.

¶69    In Mason's view, the enhanced video corroborated two key pieces of his testimony. First, Mason alleges that it "confirmed [his] testimony that the gun went off on the ground." And second, Mason alleges that it "support[ed] his testimony that he was tackled and several people were grabbing for the gun before it went off."

¶70    We have carefully reviewed the enhanced video. Even with the filtering that has now been done, the video quality is quite poor, and the images are also decidedly dark. Despite repeated viewings, and even with the benefit of knowing exactly what we are supposed to be looking for, we've been unable to discern anything specific with any level of precision. Because of this, we see no reasonable probability that the enhanced video would have meaningfully aided the defense's case, much less led to a more favorable outcome for Mason. We therefore decline to remand the case for factual development on this claim.

CONCLUSION

¶71    Mason has not persuaded us he received ineffective assistance in any of the identified respects, so we therefore affirm his conviction. And for the reasons given, we also deny Mason's request for a rule 23B remand.

———————